The District Court's Order of December 30, 1985, is hereby AFFIRMED.

**DEWEY ELECTRONICS CORP., Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Appeal No. 86–612.**

United States Court of Appeals, Federal Circuit.

Oct. 1, 1986.

Lipper and Thomas W. Petersen, Asst. Directors. Harold Kullberg, Office of Counsel, Naval Regional Contracting Center, Washington Navy Yard, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, FRIEDMAN and ARCHER, Circuit Judges.

ARCHER, Circuit Judge.

## DECISION

Dewey Electronics Corporation (Dewey) appeals from that portion of the decision, dated June 28, 1985, of the Armed Services Board of Contract Appeals (Board), ASBCA Docket No. 27073, finding the government not liable on four claims for equitable adjustment, pricing of certain items and interest. We affirm.

## BACKGROUND

On May 20, 1977, Dewey was awarded a contract with the government to manufacture automatic weather systems (AWS) for the Navy at a firm fixed price. The AWS consisted of two major components: (1) a remote sensor group which included meteorological sensors and data transmission electronics, and (2) a display group which included data reception electronics, digital displays and an analog chart recorder. Peripheral hardware associated with the AWS included a data distribution computer (DDC), an analog computer and a remote display unit. System parts were to be manufactured using government furnished equipment (GFE) in accordance with the specification requirements provided by the government. In attempting to perform the contract, Dewey encountered what it considered to be defects in the contract specification and the GFE which allegedly delayed its performance under the contract and increased its costs.

Peter S. Latham, Lewis, Kominers & Jones, Washington, D.C., for appellant.

Elizabeth Woodruff, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With her on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Howard

While not admitting that the GFE or contract specification were defective, the government nonetheless partially terminated the contract for convenience on April 14, 1978, deleting production of certain items in the weather system which required Dew-

ey to copy allegedly defective portions of the GFE. Dewey was advised of this partial termination by telegram and further advised of those items which were not to be terminated under the contract. The telegram was confirmed on April 20, 1978 by a unilateral contract modification containing an incorrect contract number and discrepancies with the earlier telegram as to those items to be terminated. The government corrected the errors on June 2, 1978 by issuing a corrected unilateral contract modification.

Dewey encountered further difficulties in producing the remaining contract items in the AWS, including mechanical problems associated with the dimensions of certain components of other GFE, operational problems in an analog chart recorder obtained from a manufacturing source that the government had allegedly indicated to be reliable, and failure of certain electronic features which were produced in conformance with other GFE that the government had provided.

On February 1, 1979, Dewey submitted a series of claims, which it called a "consolidated claim," to the contracting officer. They consisted of: $149,950.04 for "settlement of the partial termination" effected on April 14, 1978; $389,863.00 as an equitable adjustment for repricing of "unterminated and reordered units"; and $37,421.78 for unabsorbed burden. Included in the consolidated claim was a claim for delay Dewey had suffered due to alleged defects in the GFE model, the costs of which were not segregated and which were stated to be included within both the termination claim and the equitable adjustment claim.[1] By letter dated March 6, 1979, Dewey elected to proceed with its claim under the Contract Disputes Act of 1978 (CDA), Pub.L.No. 95–563, 92 Stat. 2383 (1978) (codified at 41 U.S.C. §§ 601–613 (1982)).

Dewey was requested by the contracting officer on April 6, 1979 to separate its consolidated claim into each applicable category, i.e., termination claim, delay claim or equitable adjustment claim, but Dewey failed to fully comply with this request. A settlement proposal was submitted by Dewey on October 17, 1979 to the contracting officer covering only the termination claim.

The parties settled the termination claim in January, 1981. The settlement agreement contained the following language to preserve Dewey's right to resubmit the equitable adjustment portion of its 1979 consolidated claim, which Dewey had not submitted separately as it had been instructed to do.

Article 8. Except for the terminated portion of the contract, this agreement does not preclude the contractor from submitting claims, if any, on other matters relating to the contract, including but not limited to claims for contract price increases with respect to the nonterminated units which increases result from the termination and those for equitable adjustment to the contract price under the Changes Clause which result from the following alleged causes:

(a) defective Government furnished property.

(b) changes made by the Contracting Officer.

(d) Government caused delays.

On March 2, 1982, Dewey submitted a certified equitable adjustment claim to the contracting officer seeking an increase in the contract price. It also requested interest, pursuant to 41 U.S.C. § 611, on the equitable adjustment claim which Dewey considered as outstanding since February 2, 1979, when it first submitted its consolidated claim to the contracting officer. This certified filing restated Dewey's February 2, 1979 claims, other than the settled termination claim, and added more claims which were based on facts occurring after February 2, 1979. In all, Dewey's March 2, 1982 submission contained nine separate

---

**1.** As Dewey describes them, these claims were for: (a) defects in the GFE, (b) termination for convenience, (c) reordering the terminated items and repricing of the unterminated items, and (d) unabsorbed burden.

"claims." [2] The contracting officer did not respond to these certified claims within the time required by 41 U.S.C. § 605(c)(2) (1982), and Dewey therefore filed its appeal with the Armed Services Board of Contract Appeals pursuant to 41 U.S.C. § 605(c)(5) (1982).

On June 28, 1985, the Board issued a decision, limited to consideration of the entitlement issue. It found for Dewey on five claims and remanded them to the contracting officer for "negotiation of the equitable adjustment due appellant." The Board determined that Dewey was not entitled to recover on the four other claims and Dewey now appeals each of these adverse determinations.[3]

## OPINION

### I.

The government has raised, as a jurisdictional matter,[4] the question of whether the decision of the Board constitutes a final decision within the meaning of 28 U.S.C. § 1295(a)(10) (1982). In doing so, it contends that the Board did not fully decide the case before it because five claims were remanded to the contracting officer to determine the amount that should be paid to Dewey on these claims as an equitable adjustment to the contract. The government refers to longstanding concepts of finality, requiring decision on both liability and damages, under 28 U.S.C. § 1291 (1982) relating to appeals from district courts. Reliance is also placed on decisions of our predecessor court involving the ef-fective date of the Contract Disputes Act of 1978. We do not find these to be persuasive and hold that the Board made a final decision on the four claims that are the subject of this appeal and that appeal should not be deferred pending resolution of quantum for the five claims remanded.

Our jurisdiction under 28 U.S.C. § 1295(a)(10) (1982) is to review only final decisions of agency boards of contract appeals. *United States v. W.H. Moseley Co.,* 730 F.2d 1472, 1474 (Fed.Cir.1984). The classical doctrine of finality generally requires that the order below "[end] the litigation on the merits and [leave] nothing for the court to do but execute judgment." *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 373, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978); *Catlin v. United States,* 324 U.S. 229, 233, 6 S.Ct. 631, 633, 89 L.Ed. 911 (1945).

The government points out that, in district court litigation, liability and damages have been treated as parts of a single claim, requiring that both be resolved to have a final decision within the meaning of 28 U.S.C. § 1291 (1982). *Liberty Mutual Insurance Co. v. Wetzel,* 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976). It contends from this that, so long as damages have not been resolved on the claims decided in favor of Dewey, the decision of the Board is not final.

*Liberty Mutual,* however, dealt only with a single claim for relief. In this case, multiple claims are involved and, while

---

**2.** The nine claims, which for purposes of this case are accepted as being separate claims, are described by Dewey as follows:

1. Claims for Defects in the CLIN 0001 GFE which made it non-operational (February 1979)
2. The Rosemount Sensor (March 1982)
3. The Test Simulator (March 1982)
4. Delays in First Article Approval (March 1982)
5. Impact of the Termination on Other Work (February 1979)
6. Unsuitability of the GFE as a Design and Manufacturing Standard (March 1982)
7. The Mulytek Recorder (March 1982)
8. Interest from 1 March 1979 to 2 March 1982 (March 1982)
9. The Termination and Reorder of Certain Line Items (February 1979)

**3.** The Board decided that the government was liable under claims 1–5 described in footnote 2 and determined that it had no liability on claims 6–9.

**4.** The jurisdictional question was first raised in a supplemental brief filed by the government, to which Dewey in turn filed a supplemental brief.

there might be a question as to whether the remanded claims meet the finality requirement, the claims involved in this appeal were decided with finality. *See Sears Roebuck & Co. v. Mackey, et al.,* 351 U.S. 427, 436, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956); *Cold Metal Process Co., et al. v. United Engineering & Foundry Co.,* 351 U.S. 445, 452, 76 S.Ct. 904, 908, 100 L.Ed. 1311 (1956). In *Sears,* the Court noted that the "rule generally followed in the federal courts was that, in a case involving a single plaintiff and a single defendant, a judgment was not appealable if it disposed of some, but less than all, of the claims presented," 351 U.S. at 432, n. 3, 76 S.Ct. at 897, n. 3 and that "Rule 54(b) [Fed.R. Civ.P.] modified the single judicial unit theory but left unimpaired the statutory concept of finality prescribed by [28 U.S.C.] § 1291." *Id.* at 434, 76 S.Ct. at 899.

The question then is whether the finality concept of district court litigation, requiring both liability and damages to be resolved before an appeal, is applicable to agency board proceedings.

■ In addressing this question, it is noted that there is not always "precise congruence between 'the classical jurisdictional requirements' applied to appeals from district courts and the jurisdictional standards applicable to review of administrative proceedings...." *Sun Shipbuilding & Dry Dock Co. v. Benefits Review Board, United States Department of Labor,* 535 F.2d 758, 760 (3d Cir.1976). Thus, in *Port of Boston Marine Terminal v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970), the court viewed the relevant consideration in determining the finality of an order of the Federal Maritime Commission to be "whether the process of the administrative decisionmaking has reached

a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action. *ICC v. Atlantic Coastline R. Co.,* 383 U.S. 576, 602 [86 S.Ct. 1000, 1015, 16 L.Ed.2d 109] (1966); *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 143 [59 S.Ct. 754, 763, 83 L.Ed. 1147] (1939)." *See American Dairy of Evansville, Inc. v. Bergland,* 627 F.2d 1252, 1260 (D.C.Cir.1980); *cf. Cabot Corporation v. United States,* 788 F.2d 1539 (Fed.Cir.1986) (remand to agency to make findings and determinations to be reported to the court within 90 days); *Newpark Shipbuilding & Repair, Inc. v. Roundtree,* 723 F.2d 399, 404 (5th Cir.1984) *(en banc)* (liability determined, with remand to administrative law judge to determine award). Moreover, the agency's characterization of a decision is not determinative of the finality issue and the relevant statutes outlining the required administrative procedures must be examined. *American Dairy,* 627 F.2d at 1260–61.

■ We commence by examining the statutory provisions applicable to disputed contract claims. Under the Contract Disputes Act of 1978, all contract claims must be submitted first to the contracting officer for decision.[5] The contracting officer is required to render a decision in writing. There are various provisions in 41 U.S.C. § 605(c) (1982) regarding the time frame in which the contracting officer must act but, if he fails to act, as was the case here, § 605(c)(5) provides that the inaction will be treated as a denial of the claim.

After an adverse contracting officer's decision, the contractor (but not the government) may appeal to the appropriate agency board of contract appeals, as provided in 41 U.S.C. §§ 606, 607(d) (1982),[6] or to the

---

5. 41 U.S.C. § 605(a) (1982) reads:
    (a) Contractor claims.
     All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the sub-

ject of a decision by the contracting officer. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor....

6. 41 U.S.C. § 606 (1982) reads:

United States Claims Court, as provided in 41 U.S.C. § 609(a)(1) (1982). Section 606 provides authority for a contractor to appeal a "contracting officer's *decision*," (emphasis added) and § 607(d) grants to an agency board jurisdiction "to decide any appeal from a *decision* of a contracting officer...." (Emphasis added.)[7] It is thus necessary to determine the scope of the contracting officer's decision, for this determines the extent of the contractor's right of appeal and the board's jurisdiction.

In this case, the contracting officer had failed to timely decide the claims and they were deemed to be denied. 41 U.S.C. § 605(c)(5) (1982). Clearly, then, the only issues before the Board for its decision were those of entitlement or liability. *Cf. Teller Environmental Systems, Inc. v. United States,* 802 F.2d 1385 (Fed.Cir.1986). There had been no administrative consideration of damage issues by the contracting officer and there was no occasion for the Board to consider these issues. In rendering a decision as to entitlement with respect to all nine of the constructively rejected claims, the Board decided all of the issues then before it, i.e., whether the deemed denial as to each of the claims was proper.

The legislative history of the CDA and longstanding practice of agency boards also counsel against applying a rigid district court concept of finality. The legislative history of the CDA indicates that Congress desired to restore, to the extent possible, the original purpose of the boards of contract appeals "to provide a swift, inexpensive method of resolving contract disputes," S.Rep. No. 1118, 95th Cong., 2d

Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 5235, 5246 (S.Rep. No. 95–1118). It recognized that this could not be accomplished fully because of the demand over the years that boards provide increased due process and thoroughness at the expense of speed and cost. Congress attempted to accommodate both of these sometimes inconsistent objectives by providing direct access to the courts, as well as appeal to contract boards. It anticipated that the courts would be available, *inter alia,* for complex issues and where procedural safeguards were most needed. *Id.* at 5246, 5265.

S.Rep. No. 95–1118 referred to these problems and solution in the following manner:

The boards of contract appeals originally were intended to provide a swift, inexpensive method of resolving contract disputes. Their operations and procedures have, however, been changed over the years by the demand and requirement for due process. Because of Supreme Court decisions and the Wunderlich Act, contractors and their counsel have become increasingly aware that a hearing before an agency board was often their only opportunity fully to develop and present their case. As a consequence, the parties pressed for adoption and implementation at the board level of all procedures associated with due process: Full discovery, filing of responsive pleadings and briefs, and thorough adversary hearings with witness cross-examination. The dictates of justice in these disputes have emphasized thor-

Within ninety days from the date of receipt of a contracting officer's decision under section 605 of this title, the contractor may appeal such decision to an agency board of contract appeals, as provided in section 607 of this title.
Section 607(d) provides:
    Each agency board shall have jurisdiction to decide any appeal from a decision of a contracting officer (1) relative to a contract made by its agency, and (2) relative to a contract made by any other agency when such agency or the Administrator has designated the agency board to decide

the appeal. In exercising this jurisdiction, the agency board is authorized to grant any relief that would be available to a litigant asserting a contract claim in the United States Claims Court.

7. In contrast to the authority of an agency board to review the *decision* of a contracting officer, 41 U.S.C. § 609 (1982) states that "a contractor may bring an *action directly on a claim* in the United States Claims Court...." (Emphasis added.)

oughness and due process at the expense of both speed and cost.

\* \* \* \* \* \*

The aim of any remedial system is to give the parties what is due them as determined by a thorough, impartial, speedy, and economical adjudication.

1978 U.S.Code Cong. & Ad.News at 5246.

The application of the finality rule, urged by the government, would prevent final resolution of the contractor's entitlement under one claim until the quantum could be determined by the contracting officer on other claims decided adversely to the government. It would also tend to reduce the efficiency and flexibility generally associated with administrative proceedings. For example, in order to have reasonably expeditious resolution of entitlement through appeal, the contractor would find it necessary to seek a decision from the contracting officer on both the quantum and entitlement issues and appeal both to the board to be adjudicated at the same time. At both levels, additional burdens would be placed on the parties, as well as the adjudicatory officials, to marshal and analyze detailed cost data and financial information pertaining to damages, all of which may be unnecessary if, on appeal, the entitlement is decided adversely to the contractor. Such "vexatious and expensive, and to the contractor oftentimes, ruinous litigation" is what the administrative process seeks to avoid. *See S & E Contractors, Inc. v. United States*, 406 U.S. 1, 8, 92 S.Ct. 1411, 1416, 31 L.Ed.2d 658 (1972). This would be inconsistent with Congress' obvious desire in the CDA to provide an expeditious forum for resolving contract disputes.

We also view the government's assertion that appellate review should await quantum resolution of the five remanded claims as contrary to established procedures and practices of agency boards, which routinely decide entitlement only. Typically, when a case is remanded for quantum resolution, it is not seen again by the agency board.

Only when an irreconcilable dispute arises as to quantum will the matter again be appealed to the agency board by the contractor.

The procedure suggested by the government could also have an anomalous effect on its opportunity to seek review of adverse board decisions. One of the enactments of the CDA was to provide specifically that the government would have the right to appeal from decisions of the boards, an opportunity not previously available to the government. S.Rep. No. 95–1118, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 5237, 5260; *S & E Contractors*, 406 U.S. at 17–18, 92 S.Ct. at 1420–21. If the government cannot appeal at the time an entitlement issue is decided adversely to it because the board has remanded for the determination of quantum, it follows that a board also would have to take a formal action on quantum in order for the government thereafter to institute its appeal of the entitlement issue. This derives from the fact that a contracting officer's decision is not subject to appeal by the government. In every instance then a board would have to continue to exercise jurisdiction over issues decided against the government until the quantum was resolved so that the government would then have its opportunity to appeal.

Such formality and delay because of remanded quantum issues would be inconsistent with past practices of agency boards and could lead to frustration of the clear legislative decision to grant the government an unqualified right to appeal adverse entitlement decisions by the agency boards, particularly those setting "legal precedents in government contract law." *See* S.Rep. No. 95–1118, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 5260.

The government asserts that a decision of one of our predecessor courts compels us, under *South Corp. v. United States*, 690 F.2d 1368 (Fed.Cir.1982) (*en banc*), to find that the Board's decision is non-final. We find this case inapposite.[8] In *Nab-Lord*

---

**8.** A later decision of the United States

Claims Court, relying on the *Nab-Lord* case,

*Associates v. United States*, 682 F.2d 940, 230 Ct.Cl. 694 (1982), the court determined that, for purposes of the effective date provision of the CDA, the claims were not "pending before the contracting officer." [9] There the board had decided for the contractor and remanded the claim to the contracting officer for a determination of the amount of equitable adjustment prior to the effective date (March 1, 1979) of the CDA. Quantum was settled by the parties in three separate agreements, two executed prior to the effective date of the CDA and one thereafter. In each agreement, Nab-Lord reserved the right to file a claim for interest under the CDA on the agreed settlement amounts and these were filed in February, May and July 1979. The contracting officer and the board denied the claims. The United States Court of Claims affirmed the decision of the board on the ground [10] that the "underlying [quantum] claims, with respect to which petitioner attempted to proceed under the interest provisions of the act [CDA], themselves fail to come under the provisions of the act" because on the effective date of the CDA the quantum claims were not "pending then before the contracting officer." [11]

The *Nab-Lord* decision relied on the prior decision of the court in *Monroe M. Tapper & Associates v. United States*, 611 F.2d 354, 222 Ct.Cl. 34 (1979). There the court articulated that the evident intent of Congress was "not to consider a claim which has been the subject of a contracting officer's decision and is on appeal to an agency board as still 'pending' before the contracting officer, for the act permits contractors with claims which are only pending before a contracting officer to proceed in court, yet prohibits such switching if the contracting officer's final decision is on appeal to a board." *Id.* 359, 222 Ct.Cl. at 40. Thus, the CDA permitted contractors with claims that were undecided and still pending before a contracting officer on its effective date to follow the newly-authorized procedure of proceeding directly to court once the contracting officer's decision was issued. On the other hand, a contractor was prohibited access directly to court and could not switch a case from the board to the court if a claim had once been decided by the contracting officer. The court observed that just because the contracting officer, as the representative of the government, may conclude a settlement of a claim "[t]his does not mean ... that the case is still pending before the contracting officer when, acting in a quasi-judicial capacity, the officer has rendered a final decision on the claim" prior to the CDA's effective date.

While there is language in both *Nab-Lord* and *Tapper* indicating pendency of the claims there involved before the agency board, this too must be read in the context of the effective date provision of the CDA

is also cited by the government, *P.J. Maffei Building Wrecking Corp. v. United States*, 3 Cl.Ct. 482 (1983). While distinguishable on the same basis as *Nab-Lord,* the *Maffei* result that a dispute as to the quantum portion of a claim must be heard by the same tribunal that heard the entitlement part could have been predicated on the authority of the United States Claims Court under 41 U.S.C. § 609 (1982).

9. Section 16 of the CDA provides that:
   This Act ... shall apply to contracts entered into one hundred twenty days after the date of enactment [Nov. 1, 1978]. Notwithstanding any provision in a contract made before the effective date of this Act, the contractor may elect to proceed under this Act with respect to any claim pending then before the contracting officer or initiated thereafter.

10. This ground was not urged by the government, but the court stated:
    Respondent, in its reply brief and in oral argument, withdrew all other grounds for upholding the board's decision. However, since the case turns on those other grounds, we give respondent additional baskets in which to place its eggs. While the parties, to some degree, define the issues in a case, we are obligated, to the best of our ability, to apply the law to the facts presented.
    *Nab-Lord,* 682 F.2d at 942, n. 8.

11. The court observed that the first two claims were not pending before anyone on that date because the parties had already settled them.

and its purpose. The intent of Congress was to prevent a claim which had already been appealed, or was then appealable, to a board by reason of the issuance of a contracting officer's final decision, from being switched to a court action under the new authority of the CDA for direct access to court from a contracting officer's decision.

Accordingly, since these decisions are concerned explicitly with the effective date provisions of the CDA, we do not consider them inconsistent with our determination that the Board here, in disposing of all of the entitlement questions, fully addressed all of the decisions (constructively made) of the contracting officer then on appeal to the Board. In the words of the Supreme Court, "there was no possible disruption of the administrative process; there was nothing else for the [Board] to do." *Marine Terminal,* 400 U.S. at 71, 91 S.Ct. at 209.

We hold on this basis that the court has jurisdiction to review the Board's decision denying recovery on the four claims here involved.

## II.

■ A. On the merits, Dewey first argues that the Board erred in denying its claim for equitable adjustment. It asserts that the government provided a defective weather station system (GFE) for use as a "specification" for the contract. When the specification was not suitable for its intended use, there occurred a breach of implied warranty.

The Board concluded that the GFE model weather station system was prescribed as a "design specification" for "all sensors and electronic components," since these components were required by the contract to be both "physically and functionally interchangeable with the Government Furnished model," whereas the metal parts of the model such as "cabinets, chassis, screws, nuts [and] bolts" served only as a

general performance guide because they "need not be interchangeable."

Dewey disputes that the GFE was only a performance specification as to mechanical components and would have the GFE model treated as a design specification for mechanical, as well as electronic, components. This cannot be squared with the contract language, and the Board properly rejected this contention. The Board said, and we agree, that:

> On balance, the GFE model may most accurately be characterized as a "design specification" for the electronic features (*e.g.,* components and circuitry) of the weather station system and as a general performance guide for the mechanical features (*e.g.,* metal parts) of the system.

Accordingly, the specification placed differing burdens on the contractor with respect to compliance with mechanical and electrical components of the GFE. *See J.L. Simmons Co. v. United States,* 412 F.2d 1360, 1362, 188 Ct.Cl. 684 (1969) (design specifications are explicit specifications which tell the contractor exactly how the contract is to be performed and from which no deviation is permissible, whereas performance type specifications set forth only an objective standard to be achieved).

Relying on *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed.2d 166 (1918), in which the Supreme Court articulated the principle that detailed specifications impute a warranty that if the specifications are complied with they will produce an acceptable result,[12] Dewey says the specification in the form of the GFE produced an unacceptable result. There was no requirement, where the GFE was only a performance specification for mechanical components, that Dewey follow the GFE like a road map without deviation. Thus, the alleged defects in those components of the GFE do not rise to the level of breach of warranty.

---

**12.** Our predecessor court has applied this doctrine, *see, e.g., Ordinance Research Inc. v. United States,* 609 F.2d 462, 479, 221 Ct.Cl. 641 (1979), *LaCrosse Garment Manufactur-* *ing Co. v. United States,* 432 F.2d 1377, 1384, 193 Ct.Cl. 168 (1970). *See also W.M. Schlosser Co. Inc. v. United States,* 767 F.2d 870 (Fed. Cir.1985).

Dewey similarly claims that the GFE was unsuitable as a design specification for the electronic items of the contract. It asserts that the data distributor computer (DDC) did not generate the proper output code,[13] that the back plane wiring was positioned in a way that it would "tear ... on the opening of a drawer," and that the required "standard commercial components" resulted in excessive failures.

On this issue of the output code, the Board stated:

We are not persuaded that the GFE model DDC was "defective" or "unsuitable" simply because of its failure to generate the ASCII 8 code format. We have found that, except for an intermittant [sic] malfunction which was corrected, the GFE model DDC worked in all other respects. Since the GFE model took precedence over the written specification, a DDC without ASCII 8 capability would have satisfied the requirements of the contract.

The Board determined, however, that the issue was "irrelevant" because the DDC was terminated on April 14, 1978 as a contract requirement and any increased costs or delay associated with the DDC were disposed of as a part of the parties' settlement of Dewey's termination claim. No error in this determination has been shown by Dewey.

With respect to the back plane wiring,[14] the Board found no evidence to show that it was unsuitable or actually impaired the working of the weather station, stating:

There is no evidence showing that the point-to-point back plane wiring arrangement on the GFE model actually impaired the operation of the weather station and we are not persuaded that this wiring arrangement was unsuitable for the equipment and its intended use. In particular, since the card cage drawer could be removed from the display console, we are not persuaded that the point-to-point wiring arrangement on the GFE model weather station prevented ready accessibility to all components or ease of replacement of the wires.

Dewey asserts that it had an obligation to deviate from the mechanical features of the GFE, which Dewey erroneously states includes the back plane wiring, in order to meet specification requirements relating to workmanship. The back plane wiring, however, was found by the Board not to be a mechanical feature but rather an electronic component. As such, no deviation from the GFE model was called for to satisfy any workmanship requirement where a design-type specification controlled. *See J.L. Simmons Co.,* 412 F.2d at 1362. Moreover, Dewey's first articles were built with back plane wiring as shown on the GFE and were approved by the government. Dewey has not pointed to any manner in which the Board erred in its findings and conclusions, and seems to contend only that it anticipated problems with the GFE design of the back plane wiring and decided that changes should be made to improve it. While this is laudable, it does not provide a basis for recovery.

Dewey further argues that a design defect existed by reason of specifying the use of standard electronic commercial components as found in the GFE, and that this resulted in an extreme and unreasonable rate of failure during production. Dewey presented evidence only on the rate of component failure occurring during "first article testing" without establishing the rate of failure during production. During this testing stage, Dewey was required under the contract to correct any defects and the Board held Dewey assumed the risk of failing to do so. Moreover, there was no evidence offered that the failure rate encountered by Dewey was due to the government's design. The Board found that Dewey's witnesses were unable to state the cause of the failures except to say

---

**13.** The applicable written specification required the DDC to be capable of processing an output format code known as ASCII–8.

**14.** The Board stated that back plane wiring on the GFE is the network of wires connecting the printed circuit boards in a "rat's nest" arrangement.

**660**

that individual parts were defective or not reliable. They also admitted that the circuitry design was not faulty and that they did not redesign the circuitry. We are not persuaded that the Board erred in determining that Dewey failed to prove its claim relating to component failures during the production of the weather station.

■ B. Dewey contends that the contract provisions created a breach by the government in yet another way. The contract required that Dewey provide an analog chart recorder, and identified a vendor source from which the item could be purchased. Dewey furnished a Molytek recorder and alleges that its manufacturer was a successor to the government-identified source. It also claims that the Molytek recorder was defective in design and that this was known to the government prior to the time it designated the vendor.

Without dwelling at length on this issue, the problems with Dewey's arguments are several. It did not purchase the recorder from the government-designated source and the Board found that Dewey offered no proof to show that there was a relationship between Molytek and the source named in the contract. Moreover, Molytek acknowledged and corrected the defects which it considered to be mechanical, not design, defects. Dewey has offered no evidence to establish that the recorder defects were due to causes other than improper manufacture or installation by the manufacturer. And finally, Dewey offered no proof of the government having superior knowledge that was not communicated to Dewey. We are persuaded that there was substantial evidence to support the conclusion of the Board that the recorder defects were those of the manufacturer and that, under the circumstances, the government had no liability to Dewey for any asserted defect in the Molytek recorder.

■ C. Dewey next claims that certain line items of the contract were terminated by the government and then reordered. It argues that the Board incorrectly found that Dewey knew or should have known that the government did not intend to ter-

minate these items and asserts that the formal letter of termination dated April 20, 1978 should be binding on the government. The Board, however, did not consider this notice in isolation because Dewey had previously received a telegraphic notification on April 14, 1978 which accurately described the excepted items from the partial termination. Reading these documents together, and taking account of other evidence of record, the Board held that the government "never terminated" the disputed line items and that the government intent was "clearly understood" by Dewey officials. We are persuaded that there is substantial evidence to support the Board's findings. The Board's decision gives reasonable meaning to the pertinent termination documents taken as a whole. *See State of Arizona v. United States,* 575 F.2d 855, 863, 216 Ct.Cl. 221 (1978); *Hol-Gar Manufacturing Corp. v. United States,* 351 F.2d 972, 979, 169 Ct.Cl. 384 (1965).

■ D. Finally, in connection with its claim for interest, Dewey contends that the Board's finding of abandonment of its equitable adjustment claim submitted February 2, 1979 is without evidentiary support. The Board concluded that:

[A]ppellant abandoned that claim by merely reserving the right to resubmit it at a later date, and did not revive it until it was made part of the 1982 claim that is the subject of this appeal.

Dewey first filed a "consolidated" claim on February 2, 1979, covering, *inter alia,* termination and equitable adjustment items, which was settled by agreement of a lump sum for the termination portion of the claim. Although Dewey reserved the right to resubmit equitable adjustment claims in the settlement agreement executed in 1981, the record shows that it did not do so until March 2, 1982.

We find the conclusion of the Board that Dewey effectively abandoned its equitable adjustment claim until it was revived in 1982 supported by substantial evidence. Accordingly, under 41 U.S.C. § 611

(1982),[15] Dewey is entitled to interest only from March 3, 1982, the date upon which the contracting officer received the claim.

Based on the foregoing, we affirm the decision of the Board.

AFFIRMED.

**15.** § 611. Interest

Interest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer *receives the claim* pursuant to section 605(a) of this title from the contractor until payment thereof. (Emphasis added.)