**Gordon R. ENGLAND, Secretary of the Navy, Appellant,**

v.

**CONTEL ADVANCED SYSTEMS, INC., Appellee.**

No. 04–1006.

United States Court of Appeals, Federal Circuit.

DECIDED: Oct. 6, 2004.

James D. Colt, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellant. On the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Mark A. Melnick, Assistant Director; and Nancy M. Kim, Trial Attorney.

Gayle R. Girod, Reed Smith, LLP, of Washington, DC, argued for appellee. With her on the brief was Natalia W. Geren.

Before NEWMAN, LOURIE and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Dissenting opinion filed by Circuit Judge PAULINE NEWMAN.

DYK, Circuit Judge.

Appellant the Secretary of the Navy ("the Navy") appeals from the decision of the Armed Services Board of Contract Appeals ("ASBCA" or "the Board") finding the Navy liable to Contel Advanced Systems, Inc. ("CASI") for breach of contract and remanding to the contracting officer for determination of quantum. *Contel Advanced Systems, Inc.*, ASBCA Nos. 50648, 50649, 51048, 51049, 2003 WL 21373938 (June 11, 2003). We hold that Contel's claim is essentially a claim for interest and barred by the no-interest rule. Accordingly, we reverse.

## BACKGROUND

This dispute stems from a contract to design, install and maintain a telecommunication system ("the project") for the Naval Weapons Center in China Lake, California. In 1987, the Navy issued a request for proposal ("RFP") for the project. The project was to take place in two phases: (1) an implementation phase, during which the telecommunication system would be designed and installed; and (2) a maintenance and administration phase. During the implementation phase, the contractor would first prepare a station design plan ("SDP"). After the SDP was approved by the Navy, the contractor would install the system. Thereafter, "cutover" (the time when the new telecommunication system replaced the old one) and implementation would occur. If certain performance goals were met, system acceptance would occur 30 days after cutover.

The dispute here involves one aspect of the contract relating to the implementation phase. When the RFP issued, the Navy did not know the exact quantities of certain types of station/ancillary equipment

that it would need. This equipment was listed under contract line item number B007 ("CLIN B007"). Offerors were instructed to provide fixed unit prices for items under CLIN B007. The Navy would then multiply the unit prices by its best estimate of quantity to arrive at a bid for the project. The RFP stated that the "total price for [CLIN] B007 shall be redetermined based on the quantity of equipment actually installed," pursuant to the approved SDP. (J.A. at 120.) Thus, the amount of equipment included under CLIN B007 in the original offer was to be adjusted to reflect the actual amount of equipment installed according to the SDP, and the final price was to be adjusted accordingly. The RFP asked potential offerors to quote prices for the implementation phase under four different methods of purchase: (1) straight purchase, (2) lease to ownership ("LTO"), (3) lease with option to purchase, and (4) straight lease.

CASI submitted an offer in accordance with the RFP and was awarded the contract for the project in September 1990. The Navy opted to purchase the implementation phase of the contract at the LTO price of $30,009,154.80 to be paid in 60 monthly installments. Under the LTO option, the Navy's installment payments included an interest component.

CASI prepared its initial SDP in January of 1991. It was approved by the Navy a few months later. Soon after, the parties executed several price modifications that increased the tentative LTO price for the implementation phase to $36,223,371. This new tentative LTO price was based on quantity estimates for several CLIN B007 items. The parties recognized that a number of these quantity estimates were significantly higher than the actual amount of equipment that would be installed under the approved SDP. In January 1992 CASI requested the Navy to reduce the LTO price to reflect these overestimates. In April and May of 1992 CASI performed an audit to ascertain the amounts of equipment actually installed and submitted a letter to the Navy, recommending that the LTO price be adjusted downward to $33.5 million. The parties met in May 1992 to modify the LTO price but were unable to agree to a modification at that time. Thereafter, the Navy issued a unilateral modification that, among other things, stated that the LTO price for the implementation phase remained at approximately $36.2 million. Cutover occurred on April 10, 1992, and system acceptance occurred on May 11, 1992.

In order to fund its expenditures during the implementation phase, CASI obtained a loan from its parent corporation. The full balance of this loan was due upon system acceptance. However, under the project contract, CASI would only begin to receive installment payments for the implementation *after* system acceptance. To repay the obligation to its parent corporation on system acceptance, CASI sought to obtain a third-party loan under which it would assign the Navy's installment payments to the lender. While the Navy at no time directed CASI to obtain financing, it refused to make payments to the third-party lender unless the invoices exactly matched the official contract price of approximately $36.2 million. CASI concluded that it could obtain financing only if it borrowed the full amount of the existing contract price. CASI borrowed a principal of approximately $27 million, an amount equivalent to the May 1992 contract price of approximately $36.2 million, once interest over the LTO term was added in. The approximately $27 million that was borrowed exceeded the principal amount of

the equipment actually purchased under the SDP. The excess borrowed funds were placed in an interest-bearing account. The interest rate on the deposited amount was far lower than the cost of borrowing from the third-party lender.

After system acceptance, the Navy began making monthly payments of about $600,000 (approximately one-sixtieth of the official contract price of approximately $36.2 million) to CASI's third-party lender. This continued until October 1996 when the Navy finally issued a unilateral modification reducing the LTO price to $32,351,679, a net decrease of approximately $4.4 million.[1] Curiously, CASI, which had earlier insisted that the Navy reduce the contract price, objected "that the LTO [ ] reconciliation was erroneous, and the Navy had no authority to unilaterally reduce the contract value." *Contel,* slip op. at 22. At this time the Navy had made 52 installment payments. After making another installment payment in November and a partial payment in December 1996, the Navy concluded that it had repaid the entire adjusted contract price and ceased making installment payments. Following the Navy's refusal to pay the remaining installment payments, the third-party lender demanded payment from CASI. CASI negotiated a new payment schedule with the third-party lender, which required it to pay the lender an additional $2,121,106, representing interest owed on the funds borrowed in excess of the final contract price, less the interest CASI earned from the deposit of these funds prior to the determination of the final contract price.

On February 4, 1997, CASI submitted a certified claim to the contracting officer ("CO") for $2,121,106, which as it explained represented the additional interest costs it suffered as a result of the Navy's failure to reconcile the LTO price in 1992. In a final decision dated March 14, 1997, the CO denied this claim because there "was no agreement for reimbursement of any costs incurred by CASI for financing" and "[h]ow a contractor finances its efforts ... is not the Government's concern." (J.A. at 248–249.) The CO also blamed the delay in finalizing the LTO price on CASI's failure to promptly provide an "accurate accounting" of the equipment installed. (J.A. at 248.) Further, the CO determined that the Navy had actually overpaid CASI by $279,464.32 and demanded repayment in this amount.

Several months later, CASI submitted a second certified claim that asserted "alternative theor[ies] of recovery." (J.A. at 251.) Specifically, CASI argued that the LTO price should not have been adjusted downward because it was set at a fixed price of approximately $36.8 million, regardless of the quantities of equipment installed. CASI also urged that it was entitled to the "administrative costs" and attorney's fees it incurred as a result of the Navy's "wrongful cessation of payments" to the third-party lender. (J.A. at 252–53.) Both of these theories were also rejected, and CASI appealed the denial of both certified claims to the ASBCA.

On June 11, 2003, the ASBCA issued a decision in favor of CASI on its first certified claim. The Board held that "the Navy had a duty to reconcile the [LTO price] no later than system acceptance and its refusal without a valid excuse to do so was a breach of its duty to cooperate and a

---

1. The October 1996 modification decreased the LTO price by $6,978,825.08 to account for the overestimates to CLIN B007. The modification also proposed to purchase a switch upgrade for $2,527,769.00. The net decrease in LTO price was $4,451,056.08.

breach of contract." *Contel,* slip op. at 26 (citations omitted). It rejected the Navy's arguments that "various unresolved obstacles prevented it from reconciling the LTO[ ] price by system acceptance," because it found that "reconciliation," i.e., reduction of the LTO price based upon the quantity of equipment actually installed, "could have been accomplished based on the information in the SDP" and that "CASI was eager to complete the reconciliation." *Id.* at 30.

The Board further held that the "no-interest rule" did not bar recovery on the first certified claim, which represented the additional interest costs CASI suffered as a result of the Navy's failure to promptly reconcile the LTO price. The ASBCA recognized that generally the "no-interest rule" bars the recovery of interest on delayed or defaulted money payments from the government, but that the rule can be waived by including "a provision in a Government Contract for the payment of interest [that is] 'affirmative, clear cut, and unambiguous.'" *Contel,* slip op. at 27 (quoting *United States v. Thayer–West Point Hotel Co.,* 329 U.S. 585, 590, 107 Ct.Cl. 714, 67 S.Ct. 398, 91 L.Ed. 521 (1947)). According to the Board, the no-interest rule had been waived in this case because "[t]he payment of interest was an integral part of the parties' contract." *Id.* This was evidenced by the intentional inclusion of "a component for interest" in the required monthly installment payments. *Id.* Because "the payment of interest ... was required by the contract" itself, the ASBCA held that the no-interest rule did not bar recovery on CASI's first certified claim.[2] Having decided that CASI was

entitled to recover on its first certified claim, the ASBCA remanded to the CO for a determination of quantum.

The Board dismissed as duplicative the alternative theories of recovery presented in CASI's second certified claim. It explained that the second certified claim did not present new claims, but merely "present[ed] an alternate method of measuring CASI's claimed damages and supplement[ed] the [first] certified claim to specifically identify certain costs allegedly incurred in repairing its financial relations ... when the Navy ceased making the payments called for by the payment schedule." *Id.* at 24.

The Navy appealed the ASBCA's decision on CASI's first certified claim. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

■■■ We review legal conclusions of the ASBCA without deference. *Rumsfeld v. Applied Cos.,* 325 F.3d 1328, 1334 (Fed. Cir.2003) ("*Applied Companies*"). The interpretation of a contract by the ASBCA is a question of law that is reviewed without deference on appeal. *Metric Constructors v. Nat'l Aeronautics and Space Admin.,* 169 F.3d 747, 751 (Fed.Cir.1999). The Board's findings of fact are accepted unless they are "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." *E.L. Hamm & Assocs. v. England,* 379 F.3d 1334, 1338 (Fed.Cir.2004).

### I

We must first determine whether we have jurisdiction to hear this case. CASI

---

**2.** The ASBCA also reversed the CO's determination that the Navy was entitled to recover $279,464.32 from overpayments to CASI.

contends that the decision of the ASBCA was not final because it decided only entitlement and did not reach quantum. We disagree.

■ Although 28 U.S.C. § 1295(a)(10) refers to an appeal from a "final decision," our cases have repeatedly held that the concept of finality in this context is a flexible concept. *Brownlee v. DynCorp,* 349 F.3d 1343, 1347 (Fed.Cir.2003) (*"DynCorp"*). Under section 1295(a)(10), "[t]he relevant inquiry in determining finality ... is 'the scope of the contracting officer's decision, for this determines the extent of the contractor's right of appeal and the board's jurisdiction.'" *Id.* (quoting *Dewey Elecs. Corp. v. United States,* 803 F.2d 650, 655 (Fed.Cir.1986)). In cases where the contracting officer had not yet reached issues of quantum and thus, only entitlement was before the Board, we have repeatedly found the Board's decision on entitlement "final" and within our jurisdiction under section 1295(a)(10). *See DynCorp.,* 349 F.3d at 1347; *Applied Cos.,* 325 F.3d at 1333 n. 3; *Dewey,* 803 F.2d at 654–58. As we noted in *Applied Companies,* "where the contracting officer decided only entitlement and the board thereafter decided entitlement and remanded to the parties regarding quantum, the board's decision was final and thus appealable." 325 F.3d at 1333 n. 3.

■ In this case, we have jurisdiction under section 1295(a)(10) because the scope of the CO's decision was limited to the question of entitlement. CASI argues that the CO decided quantum because, in addition to rejecting CASI's claims, the CO determined that the Navy had overpaid CASI in the amount of $279,464.32. However, the Navy's overpayment claim against CASI was separate from CASI's claim for damages against the Navy.[3] Because the CO determined that CASI was not entitled to damages, the CO never determined the quantum required by CASI's claims. The ASBCA recognized the limited scope of the CO's decision. It stated that "[o]nly entitlement is before the Board" and "remanded to the parties to negotiate quantum." *Contel,* slip op. at 2. Thus, we conclude that the ASBCA's decision was a "final decision" on the issue of entitlement. There is jurisdiction under section 1295(a)(10) to hear the Navy's appeal.[4]

## II

■ On the merits, the Navy argues that CASI is seeking interest damages that are barred by the no-interest rule. The no-interest rule bars the award of interest damages on a claim against the United States. *Library of Congress v. Shaw,* 478 U.S. 310, 317, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (*"Shaw"*). The appellant contends that the ASBCA erred by inferring a waiver of that rule. We agree with the Navy that the no-interest rule is applicable here and has not been waived.

## A

CASI urges that the no-interest rule does not apply because "[t]he interest

---

3. The Navy does not challenge on appeal the ASBCA's denial of its claim for overpayment.

4. We also reject CASI's argument that the Navy's appeal is not timely because it addresses only damages issues and not entitlement. The appeal is not directed to the quantum of damages. Rather, the Navy "challenges the board's holding that the Government is liable to pay interest," i.e., whether CASI can recover anything at all. (Reply Br. of Appellant at 8.) In its determination of entitlement the ASBCA properly reached this question and decided it in CASI's favor. We have jurisdiction to hear the Navy's appeal from that decision.

CASI seeks is not interest on a substantive claim, but the cost of money that the Government agreed to pay in order to defer payment." (Br. of Appellee at 13.)

The no-interest rule is an aspect of the basic rule of sovereign immunity. *See Shaw*, 478 U.S. at 315, 106 S.Ct. 2957; *see also Smith v. Principi*, 281 F.3d 1384 (Fed.Cir.2002). It has been construed to apply broadly to claims for interest. In *Shaw* the Supreme Court explained that:

> [T]he force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: "[T]he character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it."

*Shaw*, 478 U.S. at 321, 106 S.Ct. 2957 (quoting *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309, 1322 (1975) (alteration in original)). The rule has been held not only to bar the recovery of interest on substantive claims against the government, *see, e.g., Smith*, 281 F.3d at 1387, but also interest costs incurred on money borrowed as a result of the government's breach or delay in payment, *see, e.g., J.D. Hedin Constr. Co. v. United States*, 197 Ct.Cl. 782, 456 F.2d 1315, 1330 (1972); *see also Komatsu Mfg. Co. v. United States*, 132 Ct.Cl. 314, 131 F.Supp. 949, 950 (1955); *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353, 356–57 (1951); *Myerle v. United States*, 33 Ct.Cl. 1, 25 (1897). For example, in *J.D. Hedin*, our predecessor court held that, like interest on substantive claims against the government, "[i]nterest paid on bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the

borrower is not recoverable." 456 F.2d at 1330. The court noted that had the plaintiff "used his own money and so lost the interest which it might have earned for him, the claim ... would not have differed in principle." *Id.* (quoting *Myerle*, 33 Ct. Cl. at 25).

So too, the no-interest rule is applicable to CASI's claim. CASI's claim states that the claimed "amount represents the interest on funds which CASI urged the Navy to prepay in the Spring of 1992." (J.A. at 245.) In other words, CASI is seeking to recover the interest it paid on the extra money it was forced to borrow as a result of the Navy's delay in reconciling the LTO price. In the absence of a waiver, the no-interest rule bars the recovery of such interest damages against the government. *See, e.g., J.D. Hedin*, 456 F.2d at 1330; *Komatsu*, 131 F.Supp. at 950; *Ramsey*, 101 F.Supp. at 356–57; *Myerle*, 33 Ct.Cl. at 25.

## B

In the alternative, CASI argues that the no-interest rule has been waived by provision of its contract with the Navy. The no-interest rule can be waived only by "specific provision by contract or statute, or express consent by Congress." *Shaw*, 478 U.S. at 317, 106 S.Ct. 2957 (internal quotation and alterations omitted); *see also United States v. Thayer–West Point Hotel Co.*, 329 U.S. 585, 590, 67 S.Ct. 398, 91 L.Ed. 521 (1947) (*"Thayer–West"*) (stating that a provision requiring the government to pay interest "must be affirmative, clear-cut, [and] unambiguous."). While there is no argument that the rule was waived by statute, CASI argues the Navy waived the no-interest rule because the LTO price under the contract included an interest component. We disagree.

■ The claim here is not for the interest component of the LTO price, which the Navy has already paid. Instead, CASI claims it is entitled to "the additional amount of interest ... owed to the bank" as a result of its third-party financing. (Br. of Appellee at 20.) The inclusion of the interest component in the LTO price is not an "affirmative, clear-cut, [and] unambiguous" agreement to pay for additional interest accrued on a third-party loan as the result of the Navy's breach. *See Thayer–West,* 329 U.S. at 590, 67 S.Ct. 398. To the contrary, the contract is silent as to the method by which CASI was to fund the project.

The ASBCA found that the Navy "insist[ed] that the amount borrowed reflect the current LTO[ ] contract amount" and that "CASI's decision to proceed as it did [by borrowing more money than it knew it was actually due] was a reasonable response." *Contel,* slip op. at 16. The basis for these findings is less than clear. CASI does not explain how the Navy's insistence on the rendering of invoices corresponding to the May 1992 contract price compelled CASI to borrow more money than it knew it would ultimately be paid under the contract. However, even assuming that the Board's findings were correct, at most the Navy required only that CASI borrow an amount equivalent to the May 1992 LTO price, if CASI elected to assign the Navy's installment payments. There is no suggestion that the Navy required CASI to obtain financing, or otherwise instructed CASI to borrow money. Indeed, the Board specifically found that "[t]he Navy did not instruct CASI to borrow money, nor express any opinion as to whether or not CASI should enter into any particular form of financing agreement." *Contel,* slip op. at 8. The fact that the Navy was aware of the financing arrangement, and appar-ently inflexible in its requirements for assignment of the installment payments, is not sufficient to waive the no-interest rule.

Because there has been no waiver, the no-interest rule bars CASI from recovering the excess interest costs that occurred as a result of the Navy's failure to promptly reconcile the LTO price upon system acceptance. The ASBCA erred in holding that CASI was entitled to recover on its first certified claim.

## III

■ Finally, CASI contends that its second certified claim provided an "alternative theory of recovery" that was not based on the additional amount of interest that CASI owed the third-party lender, and therefore is not barred by the no-interest rule. (Br. of Appellee at 20.) Under this alternative theory, CASI argues that the cost of the implementation phase was awarded on a fixed price basis for a LTO price of approximately $36.8 million. Because the price was fixed, CASI contends that it is entitled to "the difference between the current LTO[ ] fixed price of $36,802,685.08 and the amount paid to date by the Navy for [the implementation phase]." (J.A. at 252.) This argument fails for a number of reasons.

First, both the contract and the RFP make clear that the estimated quantities of CLIN B007 equipment, upon which the LTO price was based, were subject to change. The project contract stated that: "[t]his is an indefinite-quantity contract for the supplies or services specified ... in the Schedule. The quantity of supplies and services specified in the Schedule are estimates only and are not purchased by this contract." (J.A. at 93.) So too, the RFP made clear that the LTO price was not

fixed. It recited that "[t]he total price for [CLIN] B007 shall be redetermined based on the quantity of equipment actually installed in accordance with the Government-approved Station Design Plan." (J.A. at 120.)

Moreover, both parties clearly understood that the LTO price was not fixed. CASI in fact repeatedly urged the Navy to adjust the LTO price to reflect the actual quantity of equipment installed. According to the ASBCA's findings, CASI asked the Navy to adjust the LTO price to approximately $33.5 million prior to system acceptance. The parties later met in a failed attempt to modify the LTO price to reflect the equipment installed under the SDP. After system acceptance in June and July of 1992, CASI continued to urge the Navy to decrease the LTO price. *Contel*, slip op. at 19.

For these reasons, we conclude that the LTO price for the implementation phase of the project was not fixed, but was to be adjusted according to the actual quantity of equipment installed. We therefore reject this "alternative theory of recovery" as presented in CASI's second certified claim.[5]

## CONCLUSION

We hold that the no-interest rule applies to CASI's first certified claim for interest damages incurred as a result of the Navy's delay in reducing the LTO price to reflect the actual quantities of equipment installed. Because we conclude that there has been no waiver of the no-interest rule, the ASBCA's decision that CASI was entitled to damages under the first certified claim

was erroneous. We also reject as a matter of law CASI's "alternative" theories as set forth in the second certified claim. Accordingly, the decision of the ASBCA is

*REVERSED.*

## COSTS

No costs.

PAULINE NEWMAN, Circuit Judge, dissenting.

The Navy did not appeal the decision of the Armed Services Board of Contract Appeals that this contract was breached to the extent found by the Board. Nor is it disputed that Contel (CASI) suffered monetary injury by the breach. The panel majority's holding that damages cannot be assessed because they are measured by the cost of money is contrary to fundamental principles of commercial relationships, and outside the scope of the "no-interest rule." Thus I must, respectfully, dissent.

In accordance with the contract between the Navy and CASI, CASI provided and installed a telecommunications system, including equipment for which the Navy estimated the maximum quantity at an estimated cost of $36,223,371. This estimate was derived from the line item cost per unit (CLIN B007) times the Navy's estimate of the maximum number of units; these were the parameters of this indefinite-quantity contract, and the validity of their adoption is not in dispute. The contract provided for payment by the Navy in sixty monthly installments, to commence following acceptance of the completed installation. It was understood, and the con-

---

5. We also reject CASI's claim for "administrative costs" stemming from the Navy's "wrongful cessation of payments" to the third-party lender. For the reasons stated above, the cessation of payment was not wrongful.

tract provides, that the total cost would be based on the number of units that were actually installed.

Before completion of the installation it was recognized by both the Navy and CASI that the actual cost would be several million dollars below the stated maximum.[1] Starting in January 1992 CASI requested a downward adjustment of the contract maximum; the record reports persistent requests by CASI for a cost reconciliation, upon acceptance of the installation on May 11, 1992, and thereafter. All of these requests were in vain, for four and a half years. This delay is significant because the Navy refused to make payments to the lender (as the financing terms required) unless the invoices were based on the original $36,223,371 contract maximum. Thus CASI was obliged to carry several million dollars of excess borrowing for over four years.

In October 1996 the Navy made the appropriate contract modification, reducing the contract cost. The Navy testified before the Board that it knew that less equipment had been installed than was originally projected, at lower total cost. The Board ruled that "the Navy had a duty to reconcile the LTOP [Lease–to–Ownership Plan] price no later than system acceptance and its refusal without a valid excuse to do so was a breach of its duty to cooperate and a breach of the contract." The Navy does not appeal the finding of breach; the appeal is solely on the question of entitlement to damages.[2]

The panel majority, reversing the Board, holds that the awarded damages are "interest" and therefore barred by the no-interest rule. That is not a proper application of the rule. These damages are not interest on a claim against the government, whereby interest on a monetary obligation of the government is not available unless authorized by statute or agreed by contract. *See Library of Congress v. Shaw*, 478 U.S. 310, 317, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (interest does not run on a judgment against the United States, absent consent or authorization); *Komatsu Mfg. Co., Ltd. v. United States*, 132 Ct.Cl. 314, 131 F.Supp. 949 (1955) (same). The damages here at issue are the direct cost to the contractor of the government's breach of contract.

The panel majority states that "[t]he no-interest rule is an aspect of the basic rule of sovereign immunity." Op. at 1379. The basic rule of "sovereign immunity," that the ruler could not be sued without his consent, was not directed to interest, but to the underlying liability. The ancient bar to recovery of interest when there was a valid underlying obligation reflects the canonical and common law prohibitions of usury, not the divine right of kings. *See Shaw*, 478 U.S. at 315, 106 S.Ct. 2957 (citing C. McCormick, *Law of Damages*, Sec. 51, p. 508 (1935) (in early common law, interest was allowed only by agreement of the parties, and was limited in amount)). As discussed in *Shaw*, 478 U.S. at 315–16, 106 S.Ct. 2957, the government has been permitted to "occupy an apparently favored position" (quoting *United States v. Verdier*, 164 U.S. 213, 219, 17 S.Ct. 42, 41 L.Ed. 407 (1896)). Enlarging the government's freedom from liability

---

1. The final audit showed a cost reduction of $6,978,825.08. Some two million dollars of this amount were used by the Navy to purchase other equipment; this aspect is not at issue.

2. The amount of damages was not determined; the Board's decision was limited to entitlement.

for breach of its obligations is unwarranted. "Sovereign immunity" is not a tool of unfairness to those who do business with government. It should not be uncritically expanded.

The Board's decision in favor of CASI was not an award of interest on a claim against the government or a judgment against the government or a debt of the government. The Board recognized that monetary injury resulted from the Navy's refusal to cooperate in reconciling the contract after completion of installation, for this breach required CASI to maintain higher borrowing than was needed. This is not a situation in which the contractor had to borrow additional sums to perform a contract after it was breached by the government, as in *J.D. Hedin Constr. Co. v. United States*, 197 Ct.Cl. 782, 456 F.2d 1315, 1330 (1972). The *Hedin* court held that interest on "bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the borrower is not recoverable as an item of damage." And the Navy's breach herein was not "a breach of contract to pay money which results only in a delay in payment," as in *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353, 356 (1951); there was no issue of delay in payment.

CASI alternatively pointed out that even on the government's theory that the damages should be treated as retaining their identity as interest on the LTOP borrowing, the Lease–to–Ownership Plan included a factor for interest. The Board found: "The Navy chose the LTOP option based on a present value analysis based on a 10% interest rate." Thus CASI offered the argument that the contract provides for payment of the obligation that CASI actually incurred, thereby waiving recourse to a no-interest rule. It was undisputed that the contract cost included recovery of the interest incurred in the LTOP option.

When damages flow from breach of an obligation that involves money, the nature of the obligation and its relationship to the economic injury must be considered in determining whether the cost of money is properly included in damages. In this case, the correctness of that measure is not challenged by the panel majority. The liability assessment by the Board of Contract Appeals does not conflict with law, and implements the national policy of fairness to contractors. *See Rumsfeld v. Applied Cos.*, 318 F.3d 1317, 1324 (Fed.Cir. 2002) (the non-breaching party is entitled to the damages that would place it in the position it would have occupied absent the breach); *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir.1997) (same). The Board's award of damages in the circumstances of this case is not barred by statute or precedent. From the court's contrary ruling, I respectfully dissent.