COAST FEDERAL BANK, FSB, Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 02–5032.

United States Court of Appeals, Federal Circuit.

DECIDED: Oct. 8, 2002.

Charles J. Cooper, Cooper & Kirk, PLLC, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Michael W. Kirk. Of counsel were David H. Thompson and Derek Lawrence Shaffer.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; Jeanne E. Davidson, Deputy Director; and John N. Kane, Jr., Trial Attorney.

Before MAYER, Chief Judge, MICHEL and GAJARSA, Circuit Judges.

MICHEL, Circuit Judge.

Coast Federal Bank seeks damages for breach of contract arising out of the 1989 enactment of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989), and its 1987 Assistance Agreement ("Agreement") with the Federal Home Loan Bank Board ("Board"). In part, the breach involved provisions of its agreement for certain accounting treatment in reports Coast was required to file with the Board before the enactment of FIRREA. The changes the Board compelled Coast to make in 1988 damaged Coast, it alleged. These reports covered the reporting years 1987 and 1988. Coast appeals the decision of the United States Court of Federal Claims granting the government's motion for partial summary judgment of no damages, *see Coast Federal Bank, FSB v. United States,* 48 Fed.Cl. 402 (Fed.Cl.2000), following grant of partial summary judgment that the government breached the Agreement. *Coast Federal Bank, FSB v. United States,* No. 92–466(C), at 1 (Order Granting Partial Summary Judgment, Mar. 23, 1998). Under the Agreement and in return for both a $299 million cash grant and accounting forbearances allowing a $299 million credit permanently and directly toward the "regulatory capital," Coast, at the invitation of the Board, acquired a failing thrift institution. Rejecting Coast's interpretation of the unique language added at the end, at its insistence, to the Agreement's provision in § 6 as guaranteeing non-amortization of the portion of "Goodwill and Other" corresponding to the $299 million credit toward regulatory capital, the trial court held that § 6 did not guarantee non-amortization. On the contrary, the court ruled that under § 20, amortization, the normal accounting treatment, was required. Given the trial court's interpretation, Coast conceded it could not prove damages. Partial summary judgment was therefore entered. This appeal, then, like the judgment below, depends on construing key provisions of the Agreement. Both parties agree, as do we, that on this record there are no triable issues of material fact, and thus summary judgment was appropriate. They disagree, of course, on who was entitled to judgment.

The parties also agree that "goodwill," an indefinite, intangible asset, is subject to

amortization under Generally Accepted Accounting Principles ("GAAP"). Further, the parties agree that the interaction of contract provisions § 6(a)(1)(C) and § 20 and the side letter designated SM–1 controls the issue here. If we accept Coast's interpretation of its final sentence that § 6(a)(1)(C) was mutually intended to assure permanent non-amortization of the portion of the entry under "Goodwill and Other" corresponding to the credit toward "total regulatory capital," then Coast is entitled to judgment. If, on the other hand, we adopt the government's interpretation that subsection (C) does not so imply, then under § 20 and SM–1, the more limited forbearance routinely allowed, GAAP (and hence amortization) applies to such amounts and we must affirm. The trial court held that Coast was properly required by the Board to revise its balance sheet to amortize the $299 million that corresponds to the credit toward total regulatory capital in its reports to the Board, even though that meant the addition to regulatory capital would diminish each year until it disappeared altogether.

The critical part of § 6(a)(1)(C) provides: "the *cash contribution* [the $299 million dollars] made under [section] 6(a)(1) shall be credited to [Coast's] net worth account and *shall constitute regulatory capital.*" (emphases added). Obviously it is not the cash contribution itself that is entered as capital, but rather an amount equal to and matching the amount of the cash contribution entered into the assets section of the balance sheet. According to Coast, the fact that it would be credited to the "net worth account and shall constitute regulatory capital" means $299 million would be directly and permanently credited toward regulatory capital and not diminish annually as it would if the corresponding goodwill was amortized. Coast

asserts that this was the understanding not only of its negotiator and executives but also of the Board, as reflected in the deposition testimony of the former Board chairman who, with other Board members, approved the Agreement by Board resolution. Coast agrees that it was required to amortize all other amounts under "Goodwill and Other," and it did so. But it argues that it properly declined to amortize the portion of the entry that offset the credit to regulatory capital, *i.e.,* the part of the "Goodwill and Other" entry corresponding to the $299 million credit toward regulatory capital (referred to hereafter as RAP or regulatory goodwill).

We agree with the trial court that the language of § 6(a)(1)(C) is sufficiently ambiguous that it should be construed with the aid of extrinsic evidence. We also agree that the effect of § 20 and the SM–1 letter is clear. We disagree, however, with the court's conclusion that, in the context of § 20, SM–1, Board standard policy and the extrinsic evidence of intent, § 6(a)(1)(C) was understood to require amortization under GAAP. We hold, on the contrary, that it was intended and understood by both sides of the negotiation to mean non-amortization, *i.e.,* GAAP would not apply to the $299 million of RAP goodwill. We hold, further, that by its own terms § 20 is subordinate to § 6(a)(C)(1), and SM–1 has no effect otherwise. Therefore, we reverse the judgment. The case is remanded for further proceedings to determine the amount of damages due to Coast.

I

In this *Winstar*-related case, Coast accepted the Board's 1987 open invitation for some healthy thrift institution to acquire an insolvent thrift, Central Savings and

Loan Association of San Diego ("Central"). As inducements, the government gave Coast two benefits: (1) a $299 million cash grant; and (2) forbearances from normal accounting practice, allowing Coast to credit an equal amount toward its regulatory capital requirement. FIRREA was then enacted in 1989. In 1992, Coast filed suit, alleging that enactment of FIRREA breached the Agreement and damaged Coast as did the 1988 actions of the Board concerning Coast's 1987 and 1988 reports. The suit was stayed pending resolution of *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Following the Supreme Court's *Winstar* decision, Coast moved for partial summary judgment as to liability, arguing in part that because the Board negated the provision in the Agreement permitting Coast to directly and permanently credit an amount equal to the cash contribution toward regulatory capital, the government breached. The government conceded the existence of an enforceable contract and its breach at least as of 1989 by enactment of FIRREA; accordingly, partial summary judgment as to liability was entered against the government. *See Coast Fed. Bank*, No. 92–466(C), at 1 (Order Granting Partial Summary Judgment). Following extensive fact and expert discovery, the parties cross-moved for summary judgment as to damages. The Court of Federal Claims granted summary judgment for the government, holding that GAAP also applies to the portion of the goodwill entry offsetting the credit toward regulatory capital and that in accordance with GAAP under FSAB No. 72 that goodwill was to be amortized over 12 ½ years. Coast timely appealed this judgment of no damages.[1] We have jurisdiction under 28 U.S.C. § 1295(a)(3).

---

1. For a more detailed explanation of the facts, *see* 48 Fed.Cl. 402.

## II

At first blush, this appeal seems to depend solely on the rules of the purchase method of accounting and the technicalities of GAAP. In actuality, however, the appeal turns on contract construction and the practical business understandings of the non-accountants who were the parties to the Agreement. The reason that the appeal turns on the understanding of the parties, to which they testified, is because the language of the three critical provisions of the Agreement is by itself ambiguous. The essential question here is: Did the Board's and Coast's decision-makers understand § 6(a)(1)(C) to make the $299 million credit toward regulatory capital a permanent and non-diminishing credit?

Absent thrifts like Coast, federal agencies would have had to take over all the failing thrifts themselves and pay depositors who had lost their savings. Of critical importance is the fact that Central, the failing thrift Coast was induced to acquire, had net liabilities of $347 million. That meant that even with the credit of $299 million to capital, upon acquisition regulatory capital might be undesirably low. The combined thrift had to be able to meet regulatory capital requirements in spite of Central's huge net liabilities. Moreover, application of GAAP to regulatory goodwill would require amortization, so a $299 million credit merely towards contributory capital would diminish by about 10% per year. The special forbearance from GAAP requirements would be one of two incentives negotiated by Coast in order to overcome the shortcomings and persuade Coast to acquire Central, with the other being the $299 million cash grant.

The trial court analyzed the parties' arguments and evidence in a careful and

lengthy opinion, after being showered with many complex and often confusing arguments. They may have made deciding the summary judgment cross motions on damages more difficult than it otherwise would have been. Similar arguments were made here.[2]

## A.

The executives of Coast, like their negotiator, Mr. Fink, believed that their incentives to acquire Central included both a cash grant, and the additional incentive of a "boost" to "regulatory capital," under subsection (C), that would not diminish incrementally, but would be a permanent credit. That is not to say that anyone believed that Coast was acquiring a permanent *asset*; rather, they all believed that Coast was acquiring regulatory capital, which would be on the other side of the balance sheet. Mr. Fink, Coast's negotiator; Mr. Martin, the CEO of Coast; and Mr. Gray, the then-chairman of the Bank Board, all testified that their understandings of the incentives behind the deal were

both the cash payment, and the forbearances of crediting regulatory capital with an additional $299 million without having to amortize the offsetting regulatory goodwill.[3] Not only that, but there was no contradictory testimony.[4]

Once the cash contribution was made, it had to be entered on the left side of the balance sheet as an asset. In order for the sheet to balance, a corresponding entry was needed on the right side of the sheet, as either a liability or as capital. Because the cash was a "gift," as opposed to a loan, it necessarily was entered not as a liability, but as capital. Thus, a credit of $299 million must have been entered into regulatory capital in order to balance the amount in the assets column. Then, in order for the regulatory capital credit to be permanent, an amount in "Goodwill and Other" which constituted the regulatory goodwill must have been non-amortizing. In other words, of the $347 million in "Goodwill and Other" corresponding to the amount of Central's liabilities, $299 million would have been regulatory goodwill and,

2. Coast also relies on examinations by federal auditors who did not criticize the non-amortization and certified that the 1987 and 1988 reports filed with the Board complied with Board regulations. The government, for its part, also relies on correspondence between the Board and two other thrifts. We do not find either helpful. In particular, the agreements the government had with the other thrifts were significantly different from the agreement with Coast so the forbearances are distinguishable. Similarly, the letter granting accounting forbearance SM–1 adds little, as it is superceded by the contract at issue in which Coast's representative specifically negotiated for a deviation from SM–1 in the form of § 6(a)(1)(C). Nor is the denial of Coast's requested but denied forbearance designated SM–2 relevant, as it refers only to the proper period for amortizing goodwill when GAAP applies. The sole issue here is *whether* GAAP applies.

3. Mr. Gray testified: "I would assume that during the lifetime of Coast Savings, or Coast Federal Savings, that unless it were modified anywhere else in this document [the contract], that it would be for a capital credit in perpetuity."

4. The only witnesses mentioned in the government's brief are Mr. Smuzynski, a staff official who recommended approval of the SM–1 forbearance, and Mr. Hargett, a former accountant at the FHLBB. Mr. Smuzynski admits that he has no memory of the Coast deal in particular, was not involved in the negotiations, and was not a party to the Agreement. Mr. Hargett similarly only reviewed the latter and his main conclusion was that they were unclear about whether the goodwill was being amortized. Thus, neither account contradicted the other witnesses in any way.

therefore, non-amortizing, leaving $48 million which would have been amortizing. Thus, the portion of Coast's "Goodwill and Other" entry corresponding to the credit toward regulatory capital could not be amortized as the Board later required after reviewing Coast's 1987 and 1988 reports unless subsection (C) provided only for temporary (1 year) credit toward capital of $299 million. In the phrase "shall constitute," subsection (C) implied the $299 million credit toward regulatory capital should be read as if it said explicitly "shall always (or every year) constitute" regulatory capital, not merely in the first year. Any other interpretation of subsection (C) is inconsistent with the intent of the parties and therefore incorrect.

The testimony in this case leaves no doubt about the intent of the parties. Coast's negotiator, Richard Fink, testified that from the discussions leading to the Agreement he understood it "did clearly provide that Coast would receive a *permanent addition* to Coast's *regulatory capital* in an amount equal to the cash contribution made under § 6(a)(1)(C)." (emphases added). Similarly, Coast's CEO, Ray Martin, testified that based on his discussions with Fink, "[t]he $298 [sic] million in cash was classified as *permanent* capital *addition* to our *net worth*. ... The cash could be treated as permanent capital on our balance sheet. Perpetuity [sic]." (emphases added).

Chairman Gray's testimony was to the same effect. The focus of that testimony was on crediting regulatory capital, a crucial incentive to get Coast to rescue the

failing Central with $347 million in net liabilities. In particular, Gray explained why the rescuing thrift would want the amount equal to the cash contribution to count permanently as regulatory capital:

> Well, I will tell you because I was president of a financial institution when I left the Bank Board and I can tell you how important capital is—regulatory capital. I can tell you because the institution where I went had a capital problem, and whenever you have a capital problem, you have regulators all over you for the rest of your life until you can escape that problem.

He also explained how adverse it would have been if amortization applied: "it's a lose-lose-lose situation when you lose such a large chunk of your regulatory capital by having someone come in and summarily and arbitrarily say this no longer counts." [5]

The criticality of preserving adequate regulatory capital cannot be disputed. If regulatory capital falls below the required amount, the thrift can be shut down, taken over by federal agencies, or subjected to a government-sponsored takeover by another thrift, as occurred here. Thus, maintaining adequate regulatory capital is a condition precedent to operating a thrift.

It was precisely for this reason that Fink insisted that the accounting forbearance designated SM–1, ordinarily contained only in a separate letter, be brought up into the contract itself and reworded to thereby reflect permanent regulatory capital, requiring a permanent forbearance from amortization of the regulatory goodwill.

---

5. The government has not presented any testimony or documents in this case that contradict Coast's witnesses. In particular, the government's negotiator, who would have been the counterpart to Fink, was noticeably not deposed nor referred to in the government's case. These absences leave Coast's witness testimony unrebutted, particularly on the question of what the parties to the contract mutually intended.

The government counters that under § 20 of the Agreement, GAAP applied to all entries on the balance sheet in reports to the Board, and neither the SM–1 letter nor § 6(a)(1)(C), the relevant portions of the Agreement, expressly stated that regulatory goodwill would not be governed by GAAP. That is true. But, as we construe it, § 6(a)(1)(C) requires *permanence*, which by necessary implication precludes GAAP treatment (*i.e.*, amortization) of the regulatory goodwill.[6] Therefore, the two provisions are actually contradictory, and since § 20 is subordinate to § 6 for this issue (as we will discuss in Part B, *post*), GAAP does not apply.

The forbearance more typical to thrift purchases, embodied in SM–1, differs from the forbearance granted by the Agreement in this case significantly.[7] According to the government, SM–1 forbearance merely allows an acquiring thrift to record an amount in "Goodwill and Other" equal to the full amount of liabilities of the failing thrift instead of assigning the cash grant to reduce net liabilities. In a sense, therefore, SM–1 forbearance does allow "double" counting on the asset side of the amount of any cash grant: once as "Cash" and once as part of "Goodwill and Other," in the same way that the Agreement in this case did. Without SM–1 the acquiring thrift would have to deduct the amount of any cash grant from the amount recorded in "Goodwill and Other." The significant difference is that SM–1 has no effect on amortization and, thus, is a narrower for-

bearance than provided in § 6(a)(1)(C) of the Agreement. Section 6(a)(1)(C) added the additional benefit of non-amortization.

In both the language of the Agreement and the circumstances surrounding the transaction, it is clear that the Board's agreement with Coast was atypical. The language of § 6(a)(1)(C) was different from the usual language and from reliance simply on SM–1. The understanding of the parties to the contract was different. Even the way the negotiations were conducted was different. Fink testified that "[i]n all of the supervisory acquisitions in which [he] had been involved prior to [that] time, [he] had negotiated directly with representatives, including counsel, of the Bank Board and FSLIC, but in the negotiations regarding Coast's acquisition of Central the agencies were represented by outside counsel." The agreement for the acquisition of Central was not at all the norm for such transactions. Thus, many of the arguments that the government makes based on SM–1 and their other normal practices are perhaps true for the typical case of the acquisition of one thrift by another, but since Coast's acquisition of Central was not typical, these arguments do not apply here.

B.

Section 20 of the Agreement has very little bearing on any of the previously mentioned issues of this case, contrary to the conclusions of the trial court. First, al-

6. That is to say that the credit to regulatory capital under the accounting forbearance in § 6(a)(1)(C) would be permanent, not that the cash assistance Coast would receive once would be somehow permanent or involve further payments.

7. The relevant text of SM–1 says:

It is the Corporation's intention that the cash contribution to be made to [Coast] pursuant to an assistance agreement to be entered into between the FSLIC and [Coast] is to be a credit to [Coast's] regulatory net worth; therefore, for regulatory accounting purposes, [Coast] may book such contribution as a direct addition to its net worth.

though § 20 is labeled as giving the "accounting principles," it really only does so in the absence of provisions governing accounting elsewhere in the Agreement. The relevant portion of § 20 is:

> Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, *except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board* . . .

(emphasis added). In other words, § 20 is only a default that controls if nothing else does. Because § 6(a)(1)(C) suggests what accounting is to be used for the regulatory goodwill corresponding to the credit to regulatory capital, in our analysis of its treatment we do not need to resort to any default and § 20 is, therefore, not applicable. Thus, where the trial court says: "[t]he Assistance Agreement therefore contemplates that, when reporting requirements are unclear, FHLBB is entitled to issue clarifications or interpretations, and that the plaintiff will be bound by FHLBB's views," *Coast Federal Bank, FSB v. United States,* 48 Fed.Cl. 402, 412 (2000), it misconstrues the meaning of § 20. The trial court considers only the portion of § 20 that defines the designation of "accounting principles" for the section in isolation from the rest of § 20, which makes it clear that any designation in § 20 only becomes relevant if other, contrary provisions of the Agreement do not exist or have gaps.

Second, under the clear language of § 20, only the Bank Board's "regulations" or "resolutions or actions" may be used to resolve ambiguities. The relevant text is:

> In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement.

It is simply *not* true that mere clarifications or "interpretations" of the Board prevail. The power to impose its resolution of ambiguities is reserved to the Board only when it has acted in one of three specified official ways, all of which require formal writings. The record does not show and the trial court opinion does not cite to "regulations, resolutions, or actions" of the Board in 1987 or 1988 that are pertinent to the present case. The trial court's statement, therefore, that the Agreement provides that "the government's interpretation will prevail in the event of an ambiguity or conflict," *Coast,* 48 Fed.Cl. at 412, is a misconstrual of § 20. A separate point is that the only time a Board "interpretation" matters is in the event that there is a conflict between what is required by the FASB and by the Bank Board, in which case "the interpretation of the Bank Board's accountant's shall govern." The trial court quotes this provision correctly but as conflicts between the FASB and the Bank Board on how GAAP applies are not at issue in this appeal, the Bank Board's accountant's "interpretation" is irrelevant and that portion of the trial court's opinion is misdirected.

Third, even if mere interpretations did control, there is nothing in the record that shows that the Board even made any interpretation relating to "the Acquisition or to this Agreement" with respect to amortization of regulatory goodwill in the relevant

time frame.[8] The only evidence presented about any interpretation is with respect to different agreements with other thrifts. We, thus, do not believe that there is any way that § 20 can apply and the trial court's reliance on "FHLBB's interpretation of GAAP" is, therefore, in error.

## III

We hold that the trial court erred in granting summary judgment of no damages in favor of the government. On remand, the trial court must determine the amount of Coast's damages resulting from the government's breach of § 6(a)(1)(C) respecting the 1987–88 reports. Accordingly, the Court of Federal Claims' grant of summary judgment is

*REVERSED and REMANDED.*

## COSTS

Costs taxable to the government.

GAJARSA, Circuit Judge, dissenting.

I respectfully dissent. The majority characterizes this case as a simple interpretation of an ambiguous contract; however, it is not so. The contract at issue is unambiguous when it is read in proper context. Interpreting the contract in context requires an understanding of the relevant accounting principles. This is an understanding the majority opinion lacks. As a result, the majority misconstrues

§ 6(a)(1)(C) of the Agreement and misapprehends basic principles of purchase method accounting.

To resolve questions of contract interpretation, the court should look first to the plain language of the entire agreement. *Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir.1993). The intention of the parties is gleaned from all the contract clauses interpreted as a whole, that is, from the four corners of the agreement. *Dewey Electronics Corp. v. United States,* 803 F.2d 650, 660 (Fed.Cir.1986). Where a contract does not define a particular—and potentially ambiguous—term, an established custom or widespread usage fills in the gaps left by the drafters. *See, e.g., Robinson v. United States,* 80 U.S. (13 Wall.) 363, 366, 20 L.Ed. 653 (1871) ("Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary."). When interpreting a contract, therefore, an established definition provided by industry usage will serve as a default rule, and that definition will control unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning. By looking to these sources for guidance, a putative ambiguity may ultimately prove to be illusory.

Such is the case here. Section 6(a)(1)(C) of the Agreement provides: "the *cash contribution* [the $299 million dollars] made

---

8. The trial court explained that "[s]ince FHLBB was never requested to issue a statement to plaintiff explaining FHLBB's interpretation of GAAP on this issue, the court looks to other contemporaneous statements and actions by FHLBB to determine its interpretation." *Coast,* 48 Fed.Cl. at 413. It then looks to various instances of FHLBB's staff interpretation of GAAP, including statements

by non-policy employees to other thrifts, its draft internal manual instructions on the general reporting forms, and the post-breach reporting history between the parties. This is improper even just for determining an interpretation of the FHLBB because these sources do not provide a contemporaneous interpretation of the Coast Agreement itself.

under [section] 6(a)(1) shall be credited to [Coast's] net worth account and *shall constitute regulatory capital.*" *Ante* at 1355. The majority's interpretation that GAAP and its amortization requirement are inapplicable to the $299 million of goodwill is an exercise in the interpretation of § 6(a)(1)(C) that strays far from the text of that section. With the help of subjective testimonial evidence, the majority reaches this conclusion by construing that "regulatory capital" in § 6(a)(1)(C) "require[s] permanence, which precludes GAAP treatment [for the corresponding goodwill]." *Ante* at 1359. However, nothing in the language, "shall constitute regulatory capital," implies permanence. Although § 6(a)(1)(C) provides that the $299 million "shall constitute regulatory capital," it fails to mention anything regarding the treatment of the corresponding $299 million of goodwill. Although the majority characterizes the $299 million of goodwill as "RAP or regulatory goodwill," *ante* at 1355, the majority's distinction between goodwill, which is amortized under GAAP, and "regulatory goodwill," which is not amortized under the majority's analysis, is completely unfounded either in law or in accounting practice, *ante* at 1357.

The meaning of the term "regulatory capital" in § 6(a)(1)(C) is not ambiguous when viewed in conjunction with § 20, which provides:

> *Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry,* except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board ...

*Ante* at 1360 (emphasis added). Section 20 cannot be read as a default provision as identified by the majority opinion. *Id.* at 1360. It is a critical section of the basic understanding of the parties. It requires that the computation and filings made pursuant to the Agreement be prepared in accordance with GAAP, unless provisions elsewhere in the Agreement authorize a departure from GAAP. The sophisticated parties in this case operated against the backdrop of GAAP. GAAP are those principles that have substantial authoritative support, such as FASB Standards and Interpretations, Accounting Principles Board Opinions, and American Institute of Certified Public Accountants Accounting Research Bulletins. Particularly germane to this case, FASB No. 72, entitled "Accounting for Certain Acquisitions of Banking or Thrift Institutions," requires that if, and to the extent that, the fair value of liabilities assumed exceeds the fair value of identifiable assets acquired in the acquisition of a banking or thrift institution, the unidentifiable intangible asset (commonly referred to as goodwill) generally shall be amortized. FASB Statement of Financial Standards No. 72 (February 1983).

When GAAP concepts are employed— such as FASB No. 72, which is relevant to the amortization of goodwill—the parties may be read as having incorporated established meanings and definitions forged in the relevant GAAP. To be sure, the parties are empowered to define particular contractual terms in ways that diverge from the definitions that control under GAAP. But, where contracting parties use terms and concepts that are firmly rooted in GAAP, and where there are no explicit signals to the contrary, we can presume that the prevailing GAAP govern. Moreover—and significantly, for purposes of this case—§ 20 of the Agreement plainly

provided that "GAAP was applied to all entries on the balance sheet reports to the Board and neither the SM–1 letter nor § 6(a)(1)(C) the relevant portion of the Agreement expressly stated that regulatory goodwill would not be governed by GAAP." *Ante* at 1356. ·

This case turns on the proper accounting treatment of goodwill, not, as the majority states, on the perceived intent of the contractual language premised upon biased testimony of Coast's witnesses. Without being cognizant of the relevant accounting principles, it may be difficult to determine that the regulatory capital referred to in § 6(a)(1)(C) is not permanent. However, the fact that regulatory capital under § 6(a)(1)(C) is not permanent can be seen if one remembers that GAAP requires goodwill to be amortized under § 20. Goodwill is the excess of cost over fair value of the identifiable net assets acquired. In this case, the goodwill amounted to $347 million, that is, the difference between the zero dollars Coast contributed to the transaction and the $347 million by which Central's liabilities exceeded its assets. Thus, the acquisition of Central by Coast generated $347 million in goodwill on the left hand side of the balance sheet. Under § 6(a)(1)(C), the cash contribution of $299 million generated $299 million in regulatory capital on the right hand side of the balance sheet. Because it is a fundamental principle of purchase method accounting that a balance sheet must balance, the amortization of goodwill as required by FASB No. 72 on the left hand side of the balance sheet requires a corresponding decrease in regulatory capital on the right hand side of the balance

sheet. Thus, regulatory capital is not permanent.

The majority is simply wrong and misconstrues basic accounting concepts in stating that "the $347 million in 'Goodwill and Other' corresponds to the amount of Central's liability, $299 million would have been regulatory goodwill and, therefore, non-amortizing." *Ante* at 1357. This reasoning is predicated on the unwarranted assumptions that Coast would have had no incentive to acquire Central unless the credit to regulatory capital was permanent, and that the credit to capital would not be permanent unless the corresponding goodwill was non-amortizing. Both assumptions are incorrect, and unsupported by the Agreement.

First, Coast had ample incentive to acquire Central despite the fact that amortizing the corresponding goodwill would incrementally reduce its regulatory capital, all else being equal. The whole point of the regulatory forbearances extinguished by FIRREA was to afford thrifts the opportunity to become profitable, capital-surplus-generating institutions again. Absent the forbearance granted to Coast, GAAP would not have permitted treating any of the $299 million as regulatory capital. Thus, the credit to regulatory capital was a substantial incentive even if the corresponding intangible asset diminished in value over time.[1] Over time, the plan was that these institutions would regain financial health. They were to be weaned off government assistance, not permanently dependent upon it. Consequently, the one-time, non-permanent credit to regulatory capital is the more realistic of the interpretations because it conforms to the appropriate accounting principles.

---

1. The $299 million FSLIC contribution credited to "Contributed Capital" under "Regulatory Net Worth" even though GAAP prohibited this "credit" because Coast contributed no cash to the merger.

Second, there is no language in the Agreement that supports the treatment of regulatory capital as "permanent." *Ante* at 1359. Nothing in the language "shall constitute regulatory capital" implies permanence. Had the contract stated, "shall constitute cash," the majority would no doubt recognize the fallacy in concluding otherwise. Of course, had the contract so stated, it would be beyond the pale to conclude that the bank could continue to record $299 million in its regulatory submissions regardless of the amount of cash it had expended, and therefore no longer actually possessed. The "shall constitute" language—although it refers to an accounting entry to be made only once—does not alter the fundamental nature of the asset to which it refers. Thus, the contract provided that the $299 million cash contribution also "shall constitute regulatory capital," but it remained ordinary regulatory capital, which is not guaranteed to remain at any given amount. If it were guaranteed to remain at that amount, no doubt the contract would have contained express language to that effect, *viz.*, "Coast's regulatory capital shall always remain at $299 million more than it would report absent this acquisition of Central." Moreover, as the majority recognized, these were sophisticated parties represented by competent counsel who would have known how to identify any such permanent capital as an equity contribution, if they intended it to operate as such, which they did not. The majority considers the Coast acquisition of Central as "not typical" of the normal acquisition of one thrift by another. The only abnormality of the transaction was the fact that FSLIC contributed $299 million and Coast did not contribute one dollar of cash to the transaction.

Likewise, nothing in the "shall constitute" language changed the nature of the corresponding $299 million intangible asset. It was "true goodwill." Like all other goodwill recorded as the result of the acquisition of a failing thrift at an amount greater than that thrift's tangible·assets, this goodwill diminished in value over time. GAAP required amortization of such goodwill, and the contract authorized no departure from GAAP.

Any remaining doubt about the interpretation of this contract should have been resolved as the Court of Federal Claims did: by resorting to the Board's interpretation, not by construing the contract against the government as the drafter of the agreement. Section 20 of the contract requires as much. I disagree with the majority's statement that § 20 "is only a default that controls if nothing else does," *ante* at 1360, because § 20 provides, in pertinent part, that "in the case of any ambiguity in the interpretation or construction of any provision of this Agreement," the ambiguity must be resolved consistently with Bank Board or FSLIC regulations, or the Bank Board's resolution where it conflicts with such regulations.

The majority inconsistently argues that § 6(a)(1)(C) "suggests what accounting is to be used" and because of this suggestion it claims that there is no need to "resort to any default and § 20 is therefore not applicable." *Ante* at 1360. This is circular logic. The accounting clause of § 20 clearly required that the computation and filings made pursuant to the Agreement be prepared in accordance with GAAP, unless provisions elsewhere in the Agreement authorize a departure from GAAP. Section 6(a)(1)(C) allowed the only departure from GAAP premised upon the SM–1 forbearance which allowed the cash contributed by FSLIC to be credited to Coast's net worth but did not eliminate the require-

ment to amortize the $347 million of goodwill generated by the acquisition.

In short, the majority's substitution of its interpretative beliefs for those of the parties without reference to relevant accounting principles is an inappropriate and unnecessary guessing game. Such guesses are not the enterprise of this court. The express language of the Agreement requires the application of GAAP absent a contractually authorized departure, and the application of the Board's interpretation where there is any ambiguity. There is neither ambiguity in the contract nor a contractually authorized departure, thus we cannot dismiss the application of GAAP as Coast successfully urges the majority to do. Such selective application of accounting principles to engender a desired result invites the havoc in the capital markets that we see today.

I would therefore have affirmed the Court of Federal Claims' judgment of no damages. I respectfully dissent from the majority's decision to reverse that judgment.