**J.C. EQUIPMENT CORPORATION,**
Appellant,

v.

**Gordon R. ENGLAND, Secretary
of the Navy, Appellee.**

No. 02–1472.

United States Court of Appeals,
Federal Circuit.

March 5, 2004.

Jane W. Vanneman, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With her on the brief were Robert D. McCallum, Jr., Deputy Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief was John McMunn, Attorney, United States Department of the Navy, of Daly City, California. Of counsel was Mark L. Josephs, Attorney, United States Department of Justice, of Washington, DC.

Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and DYK, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

In this government contract case, the Armed Services Board of Contract Appeals (Board) rendered two lengthy opinions: one on the contractor's entitlement to recover on the many claims for additional compensation it had submitted to the contracting officer, and the second on the amount of recovery on those claims on which it prevailed (the "quantum" decision). *J.C. Equip. Corp.*, 97–2 B.C.A. (CCH) ¶ 29,197, 1997 WL 545496 (A.S.B.C.A.1997) (*J.C.Equip.Corp.I* ); *J.C. Equip. Corp.*, 2002–1 B.C.A. (CCH) ¶ 31,810, 2002 WL 415627 (A.S.B.C.A.2002) (*J.C.Equip.Corp.II* ). The contractor challenges both of these decisions on numerous grounds. We affirm both of them.

## I

The basic facts, as found by the Board in its first (entitlement) decision, are not disputed. They may be summarized as follows:

In August 1984, the appellant J.C. Equipment ("J.C.") entered into a fixed-price contract to repair the fresh water system and tank at a Navy base in Califor-

Samuel A. Anderson, of Crestview, FL, argued for appellant.

nia for $623,078. *J.C. Equip. Corp. I*, 97–2 B.C.A. (CCH) ¶ 29,197 at 145,257 (Finding of Fact ("FF") 1). The contract also required J.C. to "maintain ... two sets of contract drawings showing any deviations, including buried or concealed construction and utility features revealed during construction, and upon completion of the work to deliver the marked-up sets of drawings to" the contracting officer. *Id.* at 145,274 (FF 116). Work was to begin on August 30, 1984 and be completed by May 27, 1985. *Id.* at 145,257 (FF 1).

Because of what J.C. described as a "large number of unknown obstructions and pipelines being encountered," work did not proceed smoothly. *Id.* at 145,259 (FF 14). The parties negotiated and executed "[f]orty-two (42) change order modifications" during the performance of the contract, most of which provided for additional payments to J.C. *Id.* at 145,283 (FF 175). As the contract provided, each of these "bilaterally executed modifications ... release[d] the Government from further payment to J.C." for the matters covered. *Id.* at 145,284.

By early 1986, relations between the parties had deteriorated. In an April letter, the Navy directed J.C. to show cause why the contract should not be terminated because of its "failure to diligently prosecute the work." *Id.* at 145,260 (FF 24). The letter stated that although several unexpected problems were encountered, J.C. "had been fully compensated for each changed condition and the amount of change order work would not be considered an adequate defense for failing to diligently prosecute the work." *Id.*

Although it is unclear what followed, it is undisputed that in a May 8, 1986 letter, the Navy ordered J.C. to stop work, and on May 15, 1986, "base security removed JC from the base" and work ceased. *Id.* (FF 25). Subsequently, the "Government acknowledged" that the revised contract completion date was May 9, 1986. *Id.* (FF 27).

J.C. then filed with the contracting officer a formal claim for an equitable adjustment of slightly more than two million dollars, *id.* at 145,261 (FF 32), which later was reduced to $1,251,040, *id.* at 145,288 n. 1. The contracting officer rejected most of these claims but awarded J.C. $17,820. *Id.* at 145,261 (FF 34).

In its appeal to the Board, J.C. sought recovery on forty-four separate claims. After a hearing that produced a "voluminous" record "consisting of approximately 10 to 15 thousand pages and 1,000 pages of transcript," *id.* at 145,288 n. 3, the Board allowed nineteen claims in whole or in part and rejected the remaining twenty-five claims. The claims on which J.C. prevailed were "remanded for negotiation and settlement." *Id.* at *passim.*

When the parties were unable to settle those claims, J.C. filed a quantum complaint with the Board seeking an equitable adjustment of $289,969.08. *J.C. Equip. Corp. II*, 2002–1 B.C.A. (CCH) ¶ 31,810 at 157,153. It also contended that "the issuance of the stop work order and termination of the contract was erroneous and must be converted into a termination for the convenience of the Government." *Id.*

After a further evidentiary hearing, the Board awarded J.C. $10,563.41 but did not extend its time for performance. *Id.* at 157,203. The Board also held that it lacked jurisdiction to consider J.C.'s request to change the character of the contract termination because J.C. had not raised that issue before the contracting officer. *Id.* at 157,157–58.

## II

The government contends that to the extent J.C.'s appeal challenges the

Board's denial of twenty-five of its claims in the entitlement decision, it is untimely, and we therefore have no jurisdiction to consider it. Relying upon our precedent, the government argues that the entitlement decision was a "final" one that J.C. could have appealed and that its failure to do so within the 120–day period for appeal under the Contract Disputes Act of 1978, 41 U.S.C. § 607(g)(1)(A) (2000), precludes it from challenging that decision in its appeal from the Board's quantum decision.

The government's conclusion, however, does not follow from its premise. The fact that the Board's earlier entitlement decision may have had sufficient finality to make it immediately appealable does not mean that the contractor's failure to take such appeal precludes it from challenging that ruling in its appeal from the Board's second decision, which was the Board's "final" action in the case.

Our recent decision in *Brownlee v. Dyn-Corp*, 349 F.3d 1343 (Fed.Cir.2003), is dispositive of this issue and requires rejection of the government's contention. In that case the Board held for a contractor and remanded for the parties to attempt to settle the amount of recovery—the same procedure it followed in the present case. *Id.* at 1346. On remand, the government stipulated to the amount it owed, and the Board entered a final judgment for that amount. *Id.* at 1346–47. The government then appealed from that judgment, challenging only the Board's earlier entitlement ruling in favor of the contractor. *Id.* at 1347.

This court rejected Dyncorp's contention that the government's challenge to the Board's entitlement ruling was untimely because it was not filed within 120 days of its rendition. The court pointed out that although prior decisions had permitted the parties to appeal from entitlement decisions under similar circumstances, *see, e.g.,*

*Dewey Electronics Corp. v. United States,* 803 F.2d 650, 653–58 (Fed.Cir.1986), no cases "h[e]ld [ ]or suggest[ed] that appeals [we]re *required* before the question of quantum [wa]s resolved," *DynCorp,* 349 F.3d at 1347 (emphasis in the original). The court concluded that although "the government could have appealed from the ... Board['s entitlement] decision at the time it was rendered," *id.,* the government's later appeal was "not time barred," *id.* at 1349.

In a supplemental filing here the government sought to distinguish *DynCorp* because that case involved only a single claim by the contractor, whereas here J.C. asserted multiple claims. The government provides no reason, convincing or otherwise, why this distinction should produce a different result, and we cannot discern any. Indeed, the government's position in this case is inconsistent with the policy underlying the final judgment rule: the avoidance of unnecessary multiple appeals.

Under the government's theory, J.C. was required first to appeal the Board's entitlement decision and then, if it was dissatisfied with the Board's subsequent quantum decision, take a second appeal to challenge that ruling. The government's theory thus could lead to two appeals, while the course J.C. followed permits the entire controversy between the parties to be resolved in a single appeal. We see no reason to follow the cumbersome course the government proposes. In the present appeal, J.C. may litigate questions relating to both the Board's entitlement and quantum decisions.

### III

J.C. mounts a broadside attack upon the Board's findings in both opinions, in which it challenges the Board's evaluation of the evidence on a large number of factual is-

sues. In effect, it is asking us to retry the case and to substitute our judgment for that of the Board on many of the Board's factual determinations. Under the Contract Disputes Act, however, Board decisions on factual questions are final unless, among other things, they are not supported by substantial evidence. 41 U.S.C. § 609(b). The evidence supporting the challenged factual determinations is substantial, and there is no occasion for us to discuss that evidence in detail.

Accordingly, we shall address only those legal arguments that warrant discussion.

■ A. Jack Butler, J.C.'s president, was a principal witness for J.C. The Board found that his testimony was not credible and rejected a number of J.C.'s claims based upon that testimony. J.C. contends that because the Board treated Butler as an "expert" witness, it improperly rejected his testimony and relied on contrary testimony by non-expert witnesses. It urges us to overturn the Board's finding that Butler was not a credible witness and to accept his testimony.

Although the administrative judge stated at the hearing that he would treat Butler "as an expert on utilities," the testimony of Butler that J.C. urges us to accept was not expert testimony but fact testimony. An example relates to claims 8, 17, and 18, in which the central dispute was whether J.C. procured outside "imported" dirt to use as backfill to close up its excavations (for which it sought additional compensation) or instead used dirt at the jobsite for that purpose. *J.C. Equip. Corp. I*, 97–2 B.C.A. (CCH) ¶ 29,-197 at 145,266–67, 145,272–74. Although Butler testified that "imported" dirt was used, other witnesses testified to the contrary. The Board also noted that Butler failed to support his testimony with "proof in the form of invoices or other documentation." *Id.* at 145,266 (FF 70). Butler's

testimony on the issue, like his testimony on other issues, did not present any expert evaluation and judgment, but only his description of the source of the dirt used for landfill—a factual matter. His testimony on this issue cannot be viewed as that of an expert.

■ In any event, we know of no authority, and J.C. cites none, that requires the trier of fact to credit expert testimony over conflicting non-expert testimony. The trier of fact's responsibility is to determine the weight (if any) to be given all of the evidence, whatever its character.

■ The Board adequately explained why it found Butler's testimony not credible. As it stated, his testimony was "contradicted by … former employees," frequently "lacked specificity," was quite "often uncorroborated by the record," and was "often in response to leading questions asked by his attorney." *Id.* at 145,261 (FF 38). "The fact-finder has broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed.Cir.1993). The Board's "[d]eterminations of witness credibility are virtually unreviewable." *Blank v. Dep't of the Army*, 247 F.3d 1225, 1228 (Fed.Cir. 2001) (internal quotation marks omitted). We discern no error in the Board's adverse credibility determinations regarding Butler's testimony.

■ B. As noted, J.C. and the Navy entered into a number of change order modifications of the contract that provided for additional payments to J.C. Pursuant to a provision of the contract, each of those modifications effected a release of the matters covered. The Board denied a number of J.C.'s claims as barred by the modification releases because, in executing those modifications and releases, J.C. had failed

to except from the releases the claims that it now seeks to assert, which are closely related to the subjects of the modifications.

The "Waiver and Release of Claims" clause, which, we reiterate, the original contract specifically included, provides:

> Whenever the Contractor submits a claim for equitable adjustment under any clause of th[e] contract ..., such claim shall include all types of adjustments in the total amounts to which the clause entitles the Contractor, including but not limited to adjustments arising out of delays or disruptions or both caused by such change. Except as the parties may otherwise expressly agree, the Contractor shall be deemed to have waived (i) any adjustments to which it otherwise might be entitled under the clause where such claim fails to request such adjustments, and (ii) any increase in the amount of equitable adjustments additional to those requested in the claims.

Navy Procurement Circular, No. 15, "Anti–Claims Clauses," Item II, ¶ 26–208.2(d), *reprinted in* BNA Fed. Cont. Rep., Apr. 27, 1970, at E–1, E–4. It further states, in a subsequent subsection, that "the Contractor agrees that ... he will execute a release ... as part of the supplemental agreement setting forth the aforesaid equitable adjustment, and that such release shall discharge the Government, its officers, agents and employees, from any such further claims." *Id.*

This language is explicit and unambiguous. In seeking an equitable adjustment, the contractor must include all items for which such an adjustment could be sought; failure to do so will constitute a waiver of claims not so asserted; and the contractor will execute a release of such claims as part of the receipt of an equitable adjustment.

The Board found that a number of the claims J.C. asserted were covered by the releases J.C. had executed in connection with the modifications of the contract it signed and that J.C.'s failure to except such claims from those releases barred it from now asserting them. In so ruling, the Board applied settled precedent. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987); *see also Adler Constr. Co. v. United States,* 191 Ct.Cl. 607, 423 F.2d 1362, 1364 (1970).

J.C. contends that the parties intended and understood that the releases would not cover the modification-order claims it now asserts. J.C. points to nothing in the record, however, to show that the broad and unambiguous language of the contractual release provisions do not mean what they say, or that this case involves "any of the special and limited circumstances under which a claim can be considered despite the execution of a release." *Mingus Constructors, Inc.,* 812 F.2d at 1395. Moreover, those provisions indicate how particular claims may be excepted from a release. The sentence of the release clause that provides for waiver of claims not asserted in the claim for equitable adjustment begins: "Except as the parties may otherwise expressly agree...." As the Board correctly pointed out, under the contract J.C.'s failure explicitly to except the additional claims from the waiver and release bars it now from asserting them. *Id.*

J.C. attempts to escape the release clause by asserting that it agreed to many modifications under duress. To the extent these modifications involved payments of additional money to J.C., the argument rings hollow. To the extent J.C. contends that duress caused it to abstain from asserting exceptions to the releases, the record does not support the contention.

The record shows only a single instance of conduct by the Navy that conceivably could be viewed as involving duress. After the parties had reached an impasse in the negotiation of Proposed Change Order No. 13 in May 1985, Ensign Snook, who was negotiating for the Navy, threatened to withhold the processing of previously-negotiated modifications until J.C. accepted his position. *J.C. Equip. Corp. I*, 97–2 B.C.A. (CCH) ¶ 29,197, at 145,285 (FF 182–83). After J.C. complained to Ensign Snook's superior about Snook's actions, Ensign Snook was reprimanded and the Navy assured J.C. that such conduct would not recur. *Id.* (FF 183). The parties then entered into a modification covering that change order. *Id.* (FF 181).

J.C. apparently contends that this incident tainted the subsequent modifications that the parties negotiated, since the claims that J.C. asserts involved duress all relate to modifications executed much later. *Compare* Appellant's Br. at 29 (identifying claims 11–18, 23, 24, and 32 as possibly infected by duress) *with, e.g., J.C. Equip. Corp. I*, 97–2 B.C.A. (CCH) ¶ 29,197 at 145,279 (holding that claim 32 was extinguished by Modification No. P00024); *id.* at 145,269–70 (holding that claims 12, 16, and 24 were extinguished by Modification No. P00039 and/or Modification No. P00044).

The Board found, however, that the modification executed after this incident was "negotiated in good faith" and that J.C. signed it "without reservation." *Id.* at 145,285. That finding is not clearly erroneous. There is nothing in the record that even suggests, let alone supports J.C.'s contention, that modifications entered into after the Snook incident were in any way tainted by duress. *See generally Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1329–31 (Fed.Cir.2003) (elements that es-

tablish duress rendering contract unenforceable).

■ C. J.C. contends the Board erroneously denied it an equitable adjustment for the additional and unanticipated cost it incurred in producing the "as-built" drawings, which showed "any deviations, including buried or concealed construction and utility features revealed during construction." *J.C. Equip. Corp. I*, 97–2 B.C.A.(CCH) ¶ 29,197 at 145,274 (FF 116). As noted, the contract "required [J.C.] to maintain at the job site two sets of . . . drawings[,] . . . and upon completion of the work to deliver the marked-up sets of drawings" to the contracting officer. *Id.* Although J.C. kept the drawings in its trailer at the job site at some point during the performance of the contract, the drawings were not in the trailer when the Navy turned it over to J.C. roughly a month after the Navy removed J.C. from the base. J.C. did not turn the drawings over to the Navy after the work was completed. *Id.*

J.C.'s theory is that the government prevented it from so turning over the drawings by denying it access to the trailer after J.C. had been removed from the base; that the presence of the drawings in the trailer, which was under government control, constituted a bailment of the drawings by J.C. to the government; and that the unexplained disappearance of the drawings from the trailer constituted a violation of the bailment agreement for which the government is liable.

In rejecting this claim, the Board, after noting that "JC has the burden of proving its affirmative claim against the Government by a preponderance of the evidence," found "that the drawings were not proffered to the Government at the conclusion of the contract as required. Accordingly, JC's claim fails for lack of proof." *Id.* We construe these conclusory statements as

reflecting the Board's determination that J.C. had failed to carry its burden of proof on all elements of this claim, including its alleged additional and unanticipated costs in producing the drawings and its attempted justification for failure to turn over the documents to the government at the completion of the work. The record supports the Board's rejection of this claim.

■ D. Finally, J.C. argues that the Board improperly held that it lacked jurisdiction to consider J.C.'s request that the termination of the contract for default be converted into a termination for the convenience of the government. The Board so ruled on the ground that J.C. had failed to raise that issue before the contracting officer. *J.C. Equip. Corp. II*, 2002–1 B.C.A. (CCH) ¶ 31,810 at 157,157–58 (citing *L & M Thomas Concrete Co.*, 98–1 B.C.A. (CCH) ¶ 29,560, 1998 WL 45338 (A.S.B.C.A.1998)).

We uphold that Board's ruling. The Contract Disputes Act requires that "[a]ll claims by a contractor against the government relating to a contract . . . be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). Section 606 permits a contractor to appeal a "contracting officer's decision . . . to an agency board of contract appeals." Section 607(d) states that "[e]ach agency board shall have jurisdiction to decide any appeal from a decision of a contracting officer." "In order for a board of contract appeals to have jurisdiction under the [Contract Disputes Act], the contractor's appeal must be from a decision of a contracting officer which decides a claim 'relating to' a [Contract Disputes Act] contract." *LaBarge Prods. v. West*, 46 F.3d 1547, 1550 (Fed.Cir.1995). The contracting officer did not decide whether the contract should have been terminated for the convenience of the government.

J.C. argues, however, that it raised this issue before the contracting officer, and that the latter, therefore, should have decided it. The only reference in its claim filed with the contracting officer to termination for default, however, is in the opening introductory paragraph, which refers to "[s]ubparagraph 5–D–1 [apparently titled] Termination for Default, Damages for Delays, Time Extensions" as well as several other sections of the contract (e.g., "Paragraph 3 Changes, Subparagraph 3D Defective Specifications"). There was no mention of changing such termination to one for convenience of the government.

After making the necessary certifications, the claim then lists more than fifty-seven separate items, totaling more than two million dollars, for which J.C. sought recovery. Not one of those items was a request that the contracting officer convert the alleged default termination into a termination for the convenience of the government. Nothing in the claim would even remotely suggest to the contracting officer that J.C. was making such a request. The Board correctly held that J.C. had failed to present that claim to the contracting officer and that the Board therefore had no jurisdiction to entertain it.

J.C. counters that under *Fairfield Scientific Corp.*, 78–1 B.C.A. (CCH) ¶ 13,082, 1978 WL 2252 (A.S.B.C.A.1978), and *Fulford Manufacturing Co.*, Nos. 2143, 2144, 1955 WL 808, 1955 ASBCA LEXIS 970 (A.S.B.C.A. May 20, 1955), a contractor who appeals from a contracting officer's imposition of excess costs is "entitled . . . to litigate the propriety of the original default and to seek conversion to a termination for convenience." Appellant's Br. at 32 (emphasis omitted). Those cases, neither of which is a binding precedent in this court, dealt with the different situation in which a contractor against whom excess costs had been imposed sought, in connec-

tion with challenging those costs, to convert the original default termination into one for the convenience of the government. In each case, the charges assessed against the contractor were for the excess costs the government had incurred when it hired another contractor to complete performance after the original contractor had defaulted. In both cases, the Board held that the contractor could challenge the default termination even though it had not done so before the contracting officer.

Here, on the other hand, no excess costs were assessed against J.C. J.C. had completed performance of the contract, and there had been no reprocurement by the government. Although during performance J.C. on one occasion was given an unsatisfactory performance evaluation and assessed liquidated damages of $550, *J.C. Equip. Corp. I*, 97–2 B.C.A. (CCH) ¶ 29,-197 at 145,260 (FF 27), the issues on appeal involve the amount J.C. can recover from the government, not any liability of J.C. to the government. Those two Board decisions involve entirely different situations. They do not support J.C.'s attempt to escape the effect of its failure to raise its present contention before the contracting officer.

## CONCLUSION

The decisions of the Armed Services Board of Contract Appeals are

*AFFIRMED.*