NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CCI, INC.,**
*Appellant*

**v.**

**JOHN MCHUGH, Secretary of the Army,**
*Appellee*

---

2014-1470

---

Appeal from the Armed Services Board of Contract Appeals in No. 57316, Administrative Judge Cheryl L. Scott.

---

Decided: April 10, 2015

---

JAMES E. HOWARD, Davis Wright Tremaine LLP, Seattle, WA, argued for appellant. Also represented by LISA M. MARCHESE, TRAEGER MACHETANZ, JONATHAN A. DEMELLA.

JEFFREY A. REGNER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also represented by JOYCE R. BRANDA, ROBERT E. KIRSCHMAN, JR., MARTIN F. HOCKEY, JR.

---

Before NEWMAN, REYNA, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

CCI appeals the Armed Services Board of Contract Appeals' denial of its Type I claim for equitable relief under Differing Site Condition Clause FAR 52.236-2. The Board concluded that CCI had not proven any of the four elements necessary to establish a Type I equitable adjustment claim. Accordingly, to prevail on appeal, CCI must show the Board erred on all four elements. Because substantial evidence supports the Board's decision on at least two of these elements—whether the site conditions were reasonably foreseeable to CCI and whether CCI relied on the alleged site representations—we find that CCI has not met this burden. Accordingly, we affirm.

I

On April 25, 2008, the Army issued a Request for Proposals (RFP) to plan, design, and construct an L-shaped pier and perform related work at Umm Qasr, the only deep-water seaport in Iraq. The Army found that Umm Qasr was "a critical link towards the import of life-providing assistance being provided to the people of Iraq." J.A. 4859.

Attached to the RFP was a 2007 engineering report from Andrea Engineering Tests Laboratory (the Andrea Report). The Andrea Report describes a field investigation of an area including the Umm Qasr project site, and included results obtained from disturbed samples[1], undis-

---

[1] Disturbed samples have been altered in a way that makes them unrepresentative of *in-situ* conditions. They are frequently used to determine properties of the soil that are not dependent on *in-situ* conditions, such as soil grain size.

turbed samples[2], and a Standard Penetration Test[3] performed on three boreholes.

In the "Discussion of Results" section, the Andrea Report includes several descriptions of the soil, such as:

- "The site subsoil consists mainly from two layers, the first layer of very soft, soft to medium gray sandy silty clay with amount of soluble salts and organic matter overlaying on a layer of medium, dense to very dense gray silty sand." J.A. 4809.

- "[T]he site was within the ebb and tide zone of the sea. The saturated soil condition below the water table makes the problem of settlement significant . . . ." *Id.*

- "The low bearing capacity of the soft clayey layer; could lead to excessive settlement to go out of control." J.A. 4810.

- "[The] samplers that extruded from shelby tubes of the soft clayey layer . . . exudes between the fingers when squeezed in the fist so this could described as very soft to soft sandy clayey soil." *Id.*

- "Investigation of the site area has produced evidence of some kind of collapse due to the reaction between fundamental compounds of the soil (sandy

---

[2]    Undisturbed samples contain conditions close enough to the *in-situ* conditions to be used to approximate *in-situ* structural properties.

[3]    A Standard Penetration Test is a common test used to determine the geotechnical engineering properties of soil.  It involves driving a thick-walled hollow tube into the soil with a 140-pound hammer and recording the blow count—the number of blows to the hammer necessary to increase the depth of the tube by a predetermined distance.

clayey layer) with organic matter, this collapse is impact the settlement of shallow foundation about (2 − 5) %." J.A. 4810–11.

Appendix B of the Andrea Report includes soil descriptors and the blow count data obtained from the Standard Penetration Test. The parties agree that Appendix B of the Andrea Report contains inconsistent information, because the soil descriptors indicate the soil is very soft to soft, but the blow count data indicates the soil is harder.

Another attachment to the RFP is a U.S. Agency for International Development report entitled "Umm Qasr Port Assessment" (the USAID Report). The USAID Report was prepared as a "general assessment of functions at the port and historical dredging operations at the port." J.A. 18354. It describes the history of dredging at the site, the need for continuous dredging at the site, and the locations of the dredged material disposal sites. The report also includes the following site condition description:

> The streams are alluvial and the channels are apparently composed primarily of sand and silt. Clay may be present, but no clay balls were seen in the dredged material disposal areas. There is a thin film of sun-cracked silt or clay at some of the final settlement ponding areas. Boring information shows the materials encountered in the original "new" port excavation as silty sand with small fine gravel and clay. Infill sediments since then may be of a finer, more silty nature.

J.A. 4863.

After the RFP issued, CCI agreed to join two other companies, PolyEarth Construction, International LLC (PCI) and PND Engineers, Inc. (PND), in preparing a bid proposal for the Umm Qasr project. PND and PCI were

responsible for the engineering and logistical aspects of the proposal, and CCI was responsible for the financial aspects of the proposal.

During the Umm Qasr bidding period, a number of questions were submitted to, and subsequently answered by, the Army. Two are relevant to this appeal:

Question 11: Soil investigation not enough we need more point of locations.

Answer 11: The best soil investigation data available to the government is provided in Appendix-C Geotechnical Investigation of the SOW. The contractor should assume the data provided in Appendix C is representative of the project site.

Question 42: Geotechnical Conditions: Will the government be providing any bidding assumptions associated with the existing geotechnical conditions? For bidding purposes, should the contractor assume the three borings provided are representative of the entire site?

Answer 42: The contractor should assume the three borings provided are representative of the entire site for the purposes of developing a proposal. However, additional geotechnical information may be required during the design phase of this project.

J.A. 4833; J.A. 4838.

In May 2008, CCI submitted an initial proposal for the Umm Qasr project. In August 2008, CCI submitted a revised proposal. On September 10, 2008, the Army awarded CCI the contract for the Umm Qasr project. The contract incorporated Differing Site Conditions Clause FAR 52.236-2 and Site Investigations Affecting the Work Clause FAR 52.236-3.

In 2009, CCI began construction on the Umm Qasr project. CCI initially used land-based construction methods and encountered difficulties building a crane pad due to the soil conditions at the project site. It ultimately switched to marine-based construction to complete the project.

In August 2009, CCI submitted a Type I request for equitable adjustment to the Army, alleging that it incurred additional costs as a result of soil conditions that were different than represented in the Andrea Report. The Army denied CCI's claim, and CCI appealed to the Board. The Board also denied CCI's claim. CCI appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

II

To receive an equitable adjustment for a Type I differing site condition, a contractor must prove by a preponderance of the evidence that: (1) "a reasonable contractor reviewing the contract documents as a whole would interpret them as making a representation about the site conditions"; (2) "the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents"; (3) "the contractor in fact relied on the contract representation"; and (4) "the conditions differed materially from those represented, and the contractor suffered damages as a result." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348–49 (2008). Whether a reasonable contractor reading the contract documents as a whole would interpret them as making a site-condition representation is a legal question reviewed de novo. *Id.* at 1349. The other three elements are questions of fact reviewed for substantial evidence. *Id.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1338 (Fed. Cir. 2004).

The Board held that CCI did not prove any of these four elements. Accordingly, to prevail on appeal, CCI must show that the Board erred on each of these four elements. *See Int'l Tech. Corp.*, 523 F.3d 1348–49. Because CCI has failed to show that the record does not provide substantial evidence to support the Board's findings that (1) the site conditions were reasonably foreseeable to CCI or (2) CCI did not rely on the alleged site condition representations, CCI has not met this burden.

A

When determining whether site conditions were reasonably foreseeable to the contractor, both the contract and any other information available to the contractor are considered. *Id.* at 1349. Under this standard, substantial evidence supports the Board's finding.

Specifically, the Andrea Report supports the finding that the soil conditions actually encountered were reasonably foreseeable. It frequently describes the area as having soil settlement issues and as containing soft to very soft soils. *See, e.g.*, J.A. 4809 (describing the first layer of the site subsoil as "very soft, soft to medium gray sandy silty clay"); *id.* ("The saturated soil condition below the water table makes the problem of settlement significant . . . ."); J.A. 4810 ("The low bearing capacity of the soft clayey layer; could lead to excessive settlement to go out of control."); *id.* ("[The] samplers that extruded from Shelby tubes of the soft clayey layer . . . exudes between the fingers when squeezed in the fist so this could described as very soft to soft sandy clayey soil."); J.A. 4810–11 ("Investigation of the site area has produced evidence of some kind of collapse due to the reaction between fundamental compounds of the soil (sandy clayey layer) with organic matter . . . .").

CCI asserts that because of the Army's answer to Question 42—that contractors "should assume the three

borings provided are representative of the entire site"—it reasonably relied solely on the borehole data in Appendix B of the Andrea Report. But even if this is correct, it does not show a lack of substantial evidence because the soil descriptors in Appendix B describe the soil near the project site at the relevant depth as being "[v]ery soft to soft gray to dark gray silty CLAY." J.A. 4818–19.

CCI argues that because the blow count data in Appendix B of the Andrea Report indicates a harder soil, and engineers view objective data, such as blow count data, as more reliable than soil descriptors, the soil conditions it encountered were not reasonably foreseeable.

The record shows that the inconsistencies in the Andrea Report caused engineers to be skeptical of its reliability. For example, the engineer CCI used to prepare its proposal, Mr. Nottingham, admitted that the information in Appendix B of the Andrea Report is "not consistent." J.A. 330. The Army's expert, Mr. Apted, agreed and testified that "it should have been clear that the Andrea report was limited in extent and quality and there was a risk of more difficult conditions" and that—given the amount of other data indicating softer soil conditions—the blow count data is "clearly an anomalous set of data[.]" J.A. 17468–69. According to Mr. Apted, the Andrea Report would have caused him to expect "very soft clay." J.A. 2904. Given this evidence, a reasonable mind could conclude that the soil conditions were reasonably foreseeable to CCI.

The USAID Report provides additional support for the Board's finding. It describes the need for continuous dredging near the site and the locations of the dredged material disposal sites. The Army's expert, Mr. Apted, testified that, given this report, "the risk of accumulation of silt and clay disposal arising[] from dredging could have reasonably be[en] foreseen as a significant risk." J.A. 17469.

Moreover, CCI was already aware of the area's dredging issues before it read the USAID Report. Mr. Nunn, a civil and nuclear engineer and co-founder of PCI involved in the Umm Qasr proposal and project, worked near the project site before CCI submitted its proposal. He was familiar with the area's dredging issues and knew that a dredging contractor was on site, that "[t]hey were spending millions of dollars dredging the naval port[,]" and that "the other piers were already clogged with siltation." J.A. 420.

In light of this evidence, we conclude that a reasonable mind could agree with Mr. Apted that "the conditions encountered could and should have been within the reasonable contemplation of CCI." J.A. 17469. Accordingly, we conclude that substantial evidence supports the Board's finding that the soil conditions were reasonably foreseeable to CCI.

B

Substantial evidence also supports the Board's finding that CCI did not prove that it relied on the alleged misrepresentation. CCI admits that it viewed the Andrea Report as containing inconsistent information and being insufficient to determine whether the project could be completed with land-based construction. This admission makes it unlikely that CCI relied on the Andrea Report, and provides support for the Board's finding.

Additionally, we agree with the Board that the proposal itself does not support CCI's assertion that it relied on the Andrea Report. Nothing in the proposal identifies whether land or marine construction would be performed. Although Mr. Nottingham testified that he relied on the Andrea Report and that the cost estimate in the proposal specifically factored in the cost of land-based construction, this does not mean that the Board was required to accept his testimony. The Board has "broad discretion in determining credibility because he saw the witness and heard

the testimony." *J.C. Equip. Corp. v. England*, 360 F.3d 1311, 1315 (Fed. Cir. 2004) (internal quotation omitted). Accordingly, "[t]he Board's determinations of witness credibility are virtually unreviewable." *Id.* (internal quotation omitted) (alteration in original). Moreover, even if Mr. Nottingham's cost estimate shows that CCI assumed the project could be completed using land-based construction, it does not show that the Andrea Report was the basis for CCI's assumption.

Additionally, the proposal actually provides support for the Board's finding that CCI did not rely on the Andrea Report. As CCI concedes, the Andrea Report and the proposal "depict different approximations of the depth at which sand and silt would be encountered." Appellant's Br. at 55. If CCI did in fact rely on the borehole log data from the Andrea Report to predict harder soil conditions, there is no plausible reason to believe it would not have also used the Andrea Report's approximations for what depths sand and silt would be encountered.

In light of this evidence, we hold that a reasonable mind could conclude that CCI did not rely on the Andrea Report in preparing its proposal.

## III

Because we conclude that substantial evidence supports the Board's findings that (1) the site conditions were reasonably foreseeable to CCI and (2) CCI did not rely on the Andrea Report in preparing its proposal, we do not need to reach the other two elements of CCI's equitable adjustment claim. Accordingly, we affirm the Board's conclusion that CCI is not entitled to a Type I equitable adjustment.

**AFFIRMED**